JAMES H. KERR

*vs.*

STATE OF MAINE.

Kennebec.    Opinion May 14, 1928.

*George L. Emery,*
*Walter L. Gray,* for plaintiff.
*Raymond Fellows,* Attorney General,
*Sanford L. Fogg,* Deputy Attorney General, for the State.

SITTING: WILSON, C. J., PHILBROOK, DUNN, BARNES, BASSETT, PATTANGALL, JJ.

DUNN, J.    In making the State of Maine to be suable at the instance of James H. Kerr, the Eighty-third Legislature annexed the limitation that decision of the case be by the Law Court on report of the evidence.    1927 Resolves, Chap. 237.

According to familiar canons of construction, the meaning already judicially affixed to the phrase "on report" was carried into the legislative enactment.

So the resolve is construed to contemplate that, without reference to matters of purely technical pleading, this Court shall determine from the reality of the record, that is, from the admissible

evidence and the warrantable inferences, whether, in law, the plaintiff, who having the affirmative of the issue has the burden of proof, has sustained such burden, and if he has sustained it, to what extent.

Five Hancock county towns, meaning by that the territory and inhabitants within these towns, comprise the Hancock-Sullivan Bridge District. 1921 P. & S. L., Chap. 120.

Invoking in virtue of charter right the provisions of the Bridge Act (1915 Laws, Chap. 319 as amended), the Hancock-Sullivan trustees petitioned the Hancock county commissioners and the State highway commission to meet with the trustees and as a board determine if the convenience and necessity of the public might require the spanning of the tidal waters called Taunton bay or Sullivan river, between the town of Hancock and Sullivan, with a bridge.

When it had been decided to build the bridge, the district trustees, upon which body the Legislature had imposed the task, made a preliminary survey of the intended location.

Then the highway commission prepared plans, specifications and estimates. And, on December 15, 1922, the commission invited proposals for the construction of the substructure of the bridge, the substructure to consist of two abutments and seven piers, to be filed by January 2, 1923.

The advertisement stated that plans and specifications had been made available to intending bidders at the office of the commission and pamphlets distributed by the commission afforded information concerning the character, nature, and amount of work to be performed. One of the pamphlets, entitled "Proposal Requirements," mentioned that in respect to the contour of the river bed, the soil and its depth, and the elevations of the rock surfaces, the plans, which had been based upon the survey made by the district, should not be regarded as even approximating accuracy; bidders, read the pamphlet, must examine the location of the proposed work for the purpose of becoming familiar with the conditions to be encountered.

Plaintiff signed and submitted his proposal. It recites that the bidder has examined at the site where the bridge is to be and informed himself as to conditions there. Besides, that the bidder is familiar with the terms of the proposal requirements.

He bid to furnish and supply at unit prices — subject to allowances if the estimates of quantities were increased or diminished — the materials, tools, plant and labor requisite, and to construct and complete the substructure.

His bid having been accepted, plaintiff entered into a written contract with the State of Maine, wherein he absolutely undertook to perform all that he had proposed to do, and to have the work done within three hundred days from the date of the direction to commence it; the chief engineer of the State highway commission, or his assistant, to have supervision of the work during progress, and the decision of the chief engineer as to the quality or sufficiency and quantities of performance and other practical questions in the execution of the contract to be final and conclusive, this being the language of the clause clothing the engineer with authority:

"Should any discrepancies appear or difference of opinion, or misunderstanding, arise as to the meaning of the Proposal Requirements, Plans or Specifications or as to any omission therefrom, or misstatements therein, in any respect, or as to the quality or dimensions, or sufficiency of the materials, plant or work, or any part thereof, or as to the due and proper execution of the work, or as to the measurement or quantity or valuation of any work executed under the contract, or as to additions thereupon, or deductions therefrom, or as to any other questions or matters arising out of the contract, the same shall be determined by the Chief Engineer and his decision shall be final and binding upon all parties concerned; and the Contractor shall immediately when ordered by the Chief Engineer proceed with and execute the work or works, or any part thereof, forthwith, according to such decision."

Such a provision in a building contract is binding. *Norcross* v. *Wyman*, 187 Mass., 25; *Herbert* v. *Dewey*, 191 Mass., 403; *Handy* v. *Bliss*, 204 Mass., 513, 520; *Cook* v. *Foley*, 152 Fed. 41; *Jacques* v. *Nelson Company*, 119 Maine, 388. The principle is applied in analogous situations in other Maine cases. *Veazie* v. *Bangor*, 53 Maine, 50; *Bucksport* v. *Brewer*, 67 Maine, 295, 302; *Seretto* v. *Rockland, etc., Railway*, 101 Maine, 140. See also the Massachusetts case of *Walker* v. *Orange*, 16 Gray, 193. The law

writes into a provision of such nature that the engineer must exercise his honest judgment. 6 R.C.L., 965.

Order to begin work issued March 26, 1923. Work was begun in April next following, but not completed until September, 1926, when the substructure was accepted and utilized.

Without going into all the details of the contract, which is muffled up in a phraseology such as engineers and contractors employ, it may be emphasized that the plaintiff is not claiming that the prices on which he and the State agreed proved inadequate and unjust; he does not advance that the commission, or the engineer, deliberately made deceptive representations within the inclusiveness of the generic expression "fraud"; he does not assert that the engineer was partial, that he erred in his measurements, was wrong in his classifications, or that he reduced prices. Nothing of the sort. Plaintiff virtually concedes that in strict accordance with the terms of his contract he has been paid from time to time all that is his due, except the sum of $2,481.50 certified latest by the engineer, the certificate being in evidence.

What then is the position of the plaintiff?

In the first place, plaintiff presents the mental picture that it turned out to be far more difficult to make the excavation for abutment number one — the abutment on the Hancock shore — and the excavations for three piers, counting from that abutment, than at the time of bidding he had anticipated. It is contended that the additional work necessarily done in making the excavations is not covered by the contract, and that there should be extra compensation for its performance.

The digging was soft, testifies the plaintiff, except that at the third pier there was ledge at the depth of seven feet, and, as the vertical planes defined on the plans and in the specifications did not allow angles of repose sufficient to keep the sides or walls from slumping, areas essential were excavated. The claim is that allowance should be figured therefor and for the riprap and fill and other things entailed, on the theory of an implied contract arising of necessity out of the express contract.

Despite the statement in his proposal to the contrary, plaintiff swears that in bidding he had no knowledge of conditions below the river bed, and no intimation of what he might come upon,

save from the plans, the specifications, and the pamphlet. His testimony is that, although he went to the river, he made no soundings or investigations because to have done so would have involved his expending one thousand dollars.

He, perhaps, when bidding and in contracting, expected that he would strike a different stratum than he did. But any such expectation, in view of the admonitory notice which he admits had been brought to his attention, needs must have been the child of a mind resolved to chance adventures subjacent the river bed. But expectations, of whatsoever nature, unproduced by fraud, nor brought about by conduct so gross as to imply bad faith, cannot relieve a contractor from contractual obligation. That is obvious when one thinks a little.

There is more to be said. The contract in this case has the provision that for excavation sides or slopes, no allowance shall be made to the contractor. The provision is not novel. *Bowers Hydraulic Company* v. *United States*, 211 U. S., 176, 53 Law ed., 136. Moreover, it but declares the already well settled legal proposition that a contractor under contract to excavate to a specified grade at a cubic-yard price is not entitled to recover for excavation incidental to the performance of the contract. *Norton* v. *University of Maine*, 106 Maine, 436.

Coming to consider another phase of the case.

It is told in the evidence, argues counsel for the plaintiff, that the incompetency or negligence of the chief engineer, supplemented by the inefficiency of the inspector on the job, compelled the contractor, after much protestation, to incur expense in building the aforementioned abutment and piers, and the fourth or next successive pier, greater than it was reasonable to require. Unreasonable superintendence, is the argument, forced the contractor to the very precipice of financial ruin. Still, continues counsel, the contractor, though he objected, did not refuse to go on with the work as he had been directed, nor did he leave the substructure unfinished.

Contention is that the contractor was not allowed enough "seal." "Seal" is simply and solely what the word, when the sense in which it is used is apparent, implies: concrete placed within the walls of a construction to form the floor and thereby

make a water-tight box or chamber within which submarine construction may be carried on.

Testimony on the plaintiff's side is that ample seal, that is, so he contends, seal sufficiently deeper or thicker than was had, would have tended materially to the counteracting of buoyancy and the resisting of the tide and thus obviated the occasion as well as the expense of weighting the tops of the caissons with stone to keep the caissons in position.

There is more or less confusion in the record, but lying below it all is the fact, not gainsaid and meriting stress, that the contract into which the plaintiff entered was not to make caissons, but to build the substructure for the bridge, and in relation to this the caissons were within the contract.

To speak further. The bid or proposal, which is incorporated in the contract, in naming prices for concrete, sets forth that certain concrete is to be placed in unwatered forms, the price being the highest in the schedule. A single exception is then made by these words, pen written after printed words: "except seal * * * 5 ft. thick." The exception proposes that the first five-foot thickness of concrete, though placed through water in what the contract calls a watered form, shall be paid for at the same rate as though placed in a form from which the water had been pumped. The exception, which was in the nature of a concession to the contractor, did not limit him to a five-foot seal — the contractor might have made the seal deeper — but he was limited to an unwatered-form price for a watered-form seal beyond five feet in thickness.

Still another claim is that bad directions by the inspector caused enormous difficulty and tremendous expense in the emplacement of each of the five foundations, and especially that of the third pier.

As to this claim, as to the others thus far, the plaintiff adheres to the theory of an implied liability until he is carried beyond the border-line of quasi contracts, whilst on the evidence his case is unsupported, because of the application of the contract.

The claim next made is not free from complexity. It is that the change by the State in the location of a ferry-slip or landing-place, upon which the fill from abutment number two, on the Sul-

livan shore, encroached, caused the river current to come against work in process of construction, to the contractor's pecuniary loss.

The lane or path of a chartered ferry lay between the termini legislatively designated for the bridge, and this without repealing the ferry charter or providing for change of the ferry location. True, the contract contains a clause requiring the contractor not unduly to interfere with water traffic, but in fair interpretation the clause is inclusive only of traffic up and down the river and not of traffic by the ferry.

In excavating the abutment number two the contractor dumped the earth on the shore and made a ridge or elevation, said in testimony to have been of inconvenience to ferry travelers and even dangerous, wherefore the State through its highway commission caused another slip or landing-place to be built for the use of the ferry.

The contractor must be held to have accepted the situation as it was at the time of contracting; natural and contemplated changes too were for him to accept and it was for him to be responsible for and bear any condition he himself might create in connection with the work he had undertaken to do. It was for the State to leave the situation within the contemplation of the contract. Indeed, the State impliedly agreed that it would so do. If the State made the current of the river to flow in a different course, to the disadvantage of the contractor, the loss sustained might be a proper element for damages. Where one contracting party fails to afford the other party that to which by the terms of the contract he is entitled there may be reparation. *Murray Brothers Company* v. *Aroostook Valley R. Co.,* 109 Maine, 350.

But, if there were disadvantage to the contractor, because of the change in the location of the ferry-slip, the extent thereof is so inseparably intermixed with and so indistinguishable from the other claims as to leave no basis for measuring actual damages in terms of money. When the current was changed, how long it remained changed, and the amount of damage done are undefined in the pages of the record.

In this situation, where the Court may not take further proof, nor discharge the report — because there is no other judicial court to which to send the case — it is believed to comport with

the spirit of this controversy, authorized by the Legislature between citizen and State, to leave the particular claim undecided for lack of full evidence. If the Legislature wills that the claim have further attention it can make its will known.

Defendant has introduced evidence of tendency to show consequential damages from delay in the performance of the work. Much delay is deemed to have been excused. However, if there be delay unexcused and inexcusable, then in such relation the contract provision is of this tenor:

"The Contractor failing to complete the work on or before the date set for completion in the contract, or, if an extension of time is granted, the date set by reason of such extension, shall be liable and accountable for the cost of engineering and inspection incurred after the date of completion, not as penalty for non-completion, but instead as liquidated damage for non-use of the structure, and the State of Maine through its Highway Commission shall make such deductions from the moneys due or that may become due the Contractor."

and the record lacks evidence within the compass of the provision.

This opinion might well stop here, but because of the charges of remissness which the plaintiff lays against the highway commission engineer and his assistants, and lest silence may give rise to misconception, it seems becoming to add that beyond the letter or nomination of the contract the contractor has been allowed and indulged, and not merely in respect to seal. Diligence and good faith on the part of the supervisors and the arbiter, in discharging duty as it was given each in intellectual honesty and fairness to see it, held the contractor to the complete performance of his contract.

Aside from possible loss growing out of the change in the location of the ferry-slip — which question to repeat the Court feels that it must leave undetermined — it is the conclusion of the Court that within the purview of the contract the contractor is paid for all the original work and all the extra work which he has done except, as stated above, in the sum of $2,481.50.

The mandate will be:

*Judgment for plaintiff for $2,481.50.*