CONNERSVILLE COUNTRY CLUB *v.* F. N. BUNZENDAHL, INC.
[No. 20,250. Filed December 23, 1966. Petition for rehearing withdrawn January 24, 1967. No petition to Transfer filed.]

*Alan H. Lobley* and *Ice, Miller, Donadio & Ryan,* both of Indianapolis, for appellant.

*Phillip J. Badell,* of Rushville, and *Brunner, Brown & Brunner,* of Shelbyville, both for appellee.

BIERLY, J.—This action arose out of a contract whereby appellee was to provide certain earth-moving equipment and labor which was to be used in the construction of a second nine hole golf course at the appellant's club. The contract in question, among other things provided:

". . . Regardless of the cost thereof to said F. N. Bunzendahl, Inc., no cost to Connersville Country Dlub [sic] shall exceed the maximum payment by Connersville Country Club as hereinafter provided.

"In consideration thereof, Connersville Country Club agrees to pay F. N. Bunzendahl, Inc., a minimum sum of Twenty Thousand ($20,000.00) Dollars and in no event more than Twenty-Five Thousand ($25,000.00) Dollars."

Following this above passage, the contract specifies the rates to be charged for the various pieces of equipment and the procedure to be followed in billing. At the conclusion of the billing section of the contract, the following language relating to the minimum-maximum is again found.

". . . When said 9 hole golf course is completed, said Connersville Country Club shall pay the 10% remaining unpaid on said billing within 30 days, subject to the limitation that all of said payments made to F. N. Bunzendahl, Inc., shall never exceed the sum of $25,000.00. In the event said billing shall be less than the sum of $20,000, said F. N. Bunzendahl, Inc., shall be paid a sum sufficient to constitute the total payment of $20,000.00 at the time of the last payment as herein provided."

The complaint, filed by the appellee in the trial court is entitled:

"Complaint To Foreclose Mechanic's Lien And for Damages."

Contained therein are four separate paragraphs, the first of which we must take particular notice, for it is on this paragraph alone that the trial court entered its judgment. Within said paragraph it is alleged that the appellant, sometime prior to March 30, 1962, had employed Robert Simmons as an Architect-Supervisor to design and supervise the construction of the new nine hole golf course. That prior to March 30, 1962, Robert Simmons prepared plans of the new nine hole golf course, showing the location, length and physical features of each of the nine holes. That on March 30, 1962, the appellant and appellee entered into a written contract, which contained, among other things, a provision that the appellee receive a minimum of $20,000.00, and a maximum of $25,000.00, for the use of certain equipment and labor. Pursuant to said contract, the appellee began to furnish said equipment and labor, but shortly thereafter, the appellant made certain changes and alterations in the construction plans of the nine hole golf course in many different ways.

That the Appellant made payments to the appellee, but appellee contended that there remained due and owing the sum of $17,249.41, for the use of equipment and for labor furnished by the appellee at the appellant's special instance and request. Said amount has been demanded by appellee, but refused by appellant, and that by reasons of the long and unreasonable delay, appellee alleges it is entitled to interest thereon from August 29, 1962, until the date of payment. Appellee further alleged that on September 18, 1962, and within sixty days from the time said equipment and labor was furnished, appellee filed its notice of intention to hold a mechanic's lien on the property in question. In addition, appellee prays for the recovery of a reasonable attorney fee in the amount of $2500.00. The final rhetorical paragraph submitted a demand for $17,249.41, with 6% interest, attorney fees of $2500.00, and foreclosure of the mechanic's lien.

The appellee's second paragraph of complaint proceeded upon the theory of quantum meruit for recovery of the reasonable value of the equipment provided in excess of the contract maximum on the theory that the contract had been abandoned.

The third paragraph of complaint alleges a breach of the written contract and seeks damages arising from that breach, while the fourth paragraph alleges that the appellant did not return one of the pieces of equipment, which was rented to it under the contract, in good condition and thereby seeking damages in the amount of its diminished value less normal depreciation.

The trial court found for the appellee on paragraph one of its complaint, but failed to find for either party on paragraphs two, three and four of said complaint. Judgment was entered by the court for $19,398.81, and foreclosure of the mechanic's lien.

The court, having heard the evidence, argument of counsel, and having taken the cause under advisement, among his several findings stated:

". . . and the Court, being now fully advised in the premises, now finds for the plaintiff on its first paragraph of complaint against the above defendant, and that the material allegations thereof have been proven and are true."

The salient features of the court's decree and judgment follows:

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that thereafter plaintiff entered into the performance of said contract but that from time to time thereafter defendant made certain changes, additions and alterations in the construction of said additional nine-hole golf course different and as additions to the original plans therefor.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the above plaintiff, pursuant to said written agreement, and as modified and changed by defendant as aforesaid, did furnish the earth moving equipment, operators therefor, and the other equipment and materials required of it by the above defendant in the construction of said additional nine-hole golf course on said above described real estate.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the work and labor so performed by plaintiff as aforesaid and the use of plaintiff's machinery and materials in the construction of said additional nine-hole golf course on defendant's above described real estate constituted the construction by the plaintiff of valuable, permanent and lasting improvements to defendant's above described real estate.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that defendant made partial payment to plaintiff on said contract, as modified as aforesaid, but that there remains due and owing to plaintiff from defendant for and on account of the earth moving equipment, labor performed by the operators therefor, and for other equipment and materials so furnished by plaintiff to defendant, at defendant's special instance and request, the

sum of Fifteen Thousand Five Hundred Two Dollars and Eight Cents ($15,502.08).

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that by reason of long and unreasonable delay in the payment thereof, plaintiff is entitled to interest thereon from the 29th day of August, 1962, at the rate of six per cent (6%) per annum, in the amount of One Thousand Three Hundred Ninety Six Dollars Seventy Three Cents ($1,396.73).

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that on the 18th day of September, 1962, and within sixty (60) days from the time of furnishing said equipment, materials and performing said labor and services, plaintiff filed in the Recorder's Office of Fayette County, Indiana, a notice, in writing, of its intention to hold a mechanic's lien on said above described real estate, and that plaintiff has and holds a lien on said above described real estate for the amount of its said claim, and that it is entitled to have its lien enforced against said above described real estate.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the legal services performed by Phillip J. Badell and Brunner, Brown & Brunner, plaintiff's attorneys herein, for and on behalf of plaintiff in this action, was and is of the reasonable value of Twenty Five Hundred Dollars ($2,500.00).

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the above plaintiff has and holds a valid mechanic's lien against the above described real estate of defendant, and that the same be foreclosed as is provided for by law.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that there is due from the defendant on plaintiff's first paragraph of complaint sued on herein the sum of $15,502.08 plus interest thereon from August 29, 1962, to the date hereof, February 20, 1964, in the amount of $1,396.73, and the further sum of $2,500.00, fees for plaintiff's attorneys, making a total amount of Nineteen Thousand Three Hundred Ninety Eight Dollars Eighty One Cents ($19,398.81), which sums the plaintiff is entitled to recover from the defendant, together with the costs of this action, all without relief from valuation and appraisement laws.

"IT IS FURTHER ORDERED, ADJUDGED AND DE-CREED by the Court that a certified copy of this order and decree be forthwith issued by the Clerk of the Rush Circuit Court of Rush County, Indiana, directed to the Sheriff of Fayette County, Indiana, directing and commanding the Sheriff of Fayette County, Indiana, to proceed forthwith to sell the hereinabove described real estate, as upon execution, and to apply the proceeds thereof as follows: First, to the payment of costs and accruing costs herein; second, to the payment of the judgment herein, together with interest at the rate of six percent per annum; and third, any balance remaining be paid to the defendant."

The court overruled appellant's motion for a new trial, and thence this appeal followed.

The appellant assigns as error the following:

"1. The lower court erred in overruling the defendant's 'Motion for Venire De Novo.'

"2. The lower court erred in overruling the Defendant's 'Motion for New Trial.'

"3. The lower court erred in overruling the Defendant's 'Motion to Reopen Under Rule 1-8 and to Allow Defendant to Amend its Answer.' "

Contained within said motion for a new trial are the following specifications:

"1. Error in the assessment of the amount of the recovery, in this, that the amount is too large.

"2. The decision of the court entered on February 21, 1964, is not sustained by sufficient evidence.

"3. The decision of the court filed on March 2, 1964, is not sustained by sufficient evidence.

"4. The decision of the court entered on February 21, 1964, is contrary to law.

"5. The decision of the court filed on March 2, 1964, is contrary to law.

"6. The finding of the court of February 21, 1964, is so defective and uncertain that a valid judgment cannot be properly rendered on each paragraph of complaint.

"7. The finding of the court of February 21, 1964, is defective in that the court failed to make a finding on each paragraph of the plaintiff's complaint.

"8.  The finding of the court in the 'Decree' filed on March 2, 1964, failed to make a finding on the second, third and fourth paragraphs of the plaintiffs [sic] complaint and on all of the issues submitted to the court for decision."

The appellant, in its brief, argues only that the trial court erred in overruling the defendant's 'Motion for Venire De Novo', and also, that the finding of the trial court is not sustained by sufficient evidence, and is contrary to law; thus, waiving all other alleged errors.

With respect to this latter contention, that the finding of the trial court is not supported by sufficient evidence and is contrary to law, we are of the opinion that the trial court did not err.

The appellant makes three points under this issue. The first being that paragraph one of the plaintiff's (appellee) complaint does not allege a modification of the contract maximum price. They cite no authority to show that this specification, even if true, would result in error. However, it is obvious that such an allegation is unnecessary in a case of this nature. The said paragraph is premised on the proposition that the contract in its maximum terms was modified, otherwise, there would be no necessity for this law suit or of this paragraph. The prayer for damages on paragraph one was well in excess of the maximum contract price; thus, at least the court could logically draw an inference that the maximum contract price had allegedly been modified. The appellant did not test the sufficiency of this paragraph in the trial court by use of any pleading.

Under appellant's second point, they contend there was no evidence showing a modification of the contract, changing the maximum price.

It should be noted, however, that it is not always necessary to prove a written or oral modification of a contract, inasmuch as it can be, at times, implied from the conduct of the

parties. See: *Byers Transp. Co.* v. *Fourth Nat. Bank & Trust Co., Wichita,* (10 Cir., 1964) 333 F. 2d 822; *Bankoff* v. *Wycoff,* (10 Cir., 1956) 233 F. 2d 476.

In the case at bar, the evidence most favorable to the appellee reveals that the appellant and appellee had preliminary negotiations concerning the contract. The appellant's architect-superintendent, Mr. Simmons, had submitted estimates of time, materials and machinery, which would be needed in the construction of the new nine hole golf course to the Board of Directors of the Club. He also submitted a plat which set out the location, length and outlines of the nine hole construction. All of the foregoing were submitted on or before December 21, 1961, the date of a meeting of the Board of Directors held to discuss the status of the new nine holes.

On January 26, 1962, the Board of Directors met again to discuss the new nine hole course. To quote from the minutes of the meeting the following was said:

"Lee Burke reported he has the plans for a new nine holes as submitted by Mr. Simmons who will serve as both architect and construction superintendent.
". . .
"Lee Burke distributed plans of both the old existing nine holes, and the proposed layout for the new nine holes.
". . .
"A motion was presented by L. Burgdoerfer that the Board of Governors be authorized to proceed with the building of an additional nine holes of Golf Course as outlined during the discussion in this meeting. The motion was seconded and carried by a voice vote."

It is pointed out by the appellee that among the provisions in the written contract between the appellant and the appellee was the following:

"All items to be supplied by F. N. Bunzendahl, Inc. shall be requisitioned by Robert Simmons, an Architect-Supervisor, with whom Connersville Country Club has a contract, *the*

*nature and extent of which has been disclosed to F. N. Bunzendahl, Inc.* Reasonable notice of the requirement of specified items shall be given by said Robert Simmons to F. N. Bunzendahl, Inc." (Emphasis added).

The pertinent parts of Mr. Simmons' contract are as follows:

"It is the desire of the Owner to construct an additional nine hole golf course on real estate now owned by Owner situate in Fayette County, Indiana, *and in accordance generally with preliminary sketches heretofore submitted by the Architect-Superintendent.*

". . .

"In consideration of said employment, said Architect-Superintendent does hereby agree to supervise the construction of said additional nine hole golf course according to the terms of this Agreement *in accordance with the plans approved by the Owner.*

*"Said Architect-Superintendent shall at least thirty (30) days prior to May 1, 1962, stake out the additional nine hole golf course clearly outlining tees, fairways, greens and any changes in water courses and shall be on the grounds as needed during any early clearing or earth moving.* For said services, said Architect-Superintendent shall be paid a proportionate part of the basic fee hereinafter provided based upon the number of days required to perform said service, but not to exceed thirty (30) days. *It shall be a condition precedent to the obligation of either the Owner or Architect-Superintendent to perform any further provisions of this Agreement that said course, as so staked by the Architect-Superintendent, be approved by the Owner prior to May 1, 1962. If the Owner does not so approve said staked-out course by said date, this contract shall be null and void and of no effect.*

"Said Architect-Superintendent shall keep daily reports on hourly labor employed and daily reports of equipment used by the Owner as well as a current record of other expenses incurred by Owner in said construction, other than expenses for materials and supplies ordered by Owner. *The purpose of this requirement shall be to keep Owner informed on a daily basis of the cost of that part of the construction which shall be under the control of said Archi-*

*tect-Superintendent. Daily reports thereof shall be made to the Owner.*

"...

"Except as herein otherwise provided with regard to preliminary staking, said construction shall be commenced on May 1, 1962, *and completed not later than September 1, 1962. Time is the essence of this Agreement and shall be construed as a condition hereof.*

"...

"Said Architect-Superintendent shall be paid an additional sum of Three Thousand ($3,000.00) Dollars not later than Sixty (60) days after comple*titi*on of construction only if the following three (3) conditions shall be deemed to exist by the Board of Directors of Connersville Country Club, towit: First, the total cost of construction, exclusive of the value of land already owned by Owner, shall not exceed Sixty Two Thousand ($62,000.00) Dollars; Secondly, said Board of Directors of said Connersville Country Club shall, by resolution, express their satisfaction with said additional nine hole golf course on or before said Sixty (60) days have elapsed; and Third, said Architect-Superintendent shall have complied with all of the terms of this Agreement on his part to be performed." (Emphasis Added).

It becomes evident that it was the intention of the parties to have the course designed prior to the time of execution of the written contract; and, also staked out at least thirty days prior to May 1, 1962.

There was also testimony introduced by Mr. Simmons as well as by Mr. Ralph Newquist, President of the Connersville Country Club, to the effect that the course was staked out prior to the signing of the written contract between appellant and appellee.

Mr. Newquist also testified as follows on cross-examination:

"Q. Mr. Newquist, I call you attention to this agreement marked Plaintiff's Exhibit Q, and ask you to look at this. That's the contract between the Architect-Superintendent, Mr. Simmons, and the Country Club, wherein it states that the Architect-Superintendent shall at least thirty (30) days prior to May 1st, 1962, stake

out said additional nine hole golf course. Is this correct?

"A. You have read it sir.

"Q. So to your knowledge—STRIKE THAT PLEASE.

"Q. It could have been staked and laid out as late as March the 31st. Is this correct?

"A. No.

"Q. Do you know when it was staked and laid out?

"A. It was staked prior to the signing of the contract with Mr. Bunzendahl.

"Q. When was the contract with Bunzendahl signed?

"A. If I recall correctly, about the 29th day of March.

"Q. Then could it have been the 28th day of March that this was staked out?

"A. Being an engineer, no, because it takes time to submit a bid.

"Q. What would the staking out have to do with the submitting of a bid?

"A. As I said, I am an engineer by profession, and no contractor would submit a bid without knowing what his job was to be and what was to be required of him. Therefore, something in either a final or a preliminary way had to be submitted for that particular reason. This isn't guess work.

"Q. Well, do you know when it was staked out, yes or no?

"Mr. Brunner: He's already answered that question. Your Honor.

"Judge: He may answer it again. Go ahead.

"A. I know that it was staked prior to the contract, yes.

"Q. I have no further questions."

The appellee, on direct-examination, testified as follows concerning the staking out of the course:

"Q. Now do you recall whether or not the general layout for this new improvement was ever staked out before you signed the contract or made your bid.

"A. Yes sir, that's the Sunday that I'm talking about, that we walked around with these certain Board members

over the course, and it was pointed out to where this green was going to be, where the tee was going to be and so on.

"Q. Do I understand the stakes were then up?

"A. Some of the stakes were there, yes sir, Mr. Brunner.

"Q. Well, can you describe the stakes that were there?

"A. Well, he had different markings. I don't know exactly what meant what now. I knew then, because he explained; but if there was a green, I think he had one stake. If it was going to be a tee, he had cross stakes driven down. But anyway, that was the extent. And then the fairways, some of the fairways had a stake here or there, trying to outline the fairways.

". . .

"Q. Will you please tell the Court generally the location of the stakes that you saw in connection with the layout as it appears on Plaintiff's Exhibit A-3?

"A. This is the print that was used when he laid it out, when Mr. Simmons laid it out, because of the different shapes and so on of the way it's shown on this print. This is the original print. And this is the print that I figured my job off of.

"Q. And the stakes that were out there, I want you to tell the Court, if you can recall, as best you can, how they compared in location to the diagram and appearing here on Plaintiff's Exhibit A-1, or A-3.

"A. Well, at that time, they agreed pretty well with this. I know we had quite a bit of trouble getting back into this stake, because of the brush and the briars.

". . .

"Q. Now Mr. Bunzendahl, in preparing and submitting your bid upon which this contract was drawn, now we ask you sir if you relied on the representations made to you through the plat and the estimates that you have testified about.

"A. Yes.

"Mr. Lobley: I object to that, Your Honor. He hasn't testified what representations.

"Q. About which he has testified.

"Judge: Oh, objection's overruled.

"A. Yes sir, that's the only way I would have had to base my price or figures."

It appears that the appellee used these sketches and stakes upon which to base his estimates of labor, machinery and time necessary to complete the contract. It is common knowledge that such procedure is common in the building and construction industry. Surely, one could not enter into a contract which set a maximum price unless he was confident he could perform the terms of the contract and make at least a small profit for his time and trouble. By virtue of the appellant's architect-engineer making significant changes in the layout and construction of the new course as agreed to by the parties, (as well as some on the old nine hole course), we find that appellant and appellee modified the contract to such an extent that it is equitable that the maximum price provision be also modified.

If we were to accept appellant's position and argument, the appellant could theoretically be entitled to a golf course which could run from Connersville to Indianapolis, and at a price not to exceed the maximum stated in the contract. This is an absurd deduction, but where do we draw the line? We do not intend to state a hard and fast rule which can be applied in every case, for each case has its special circumstances, but it is clear that in this case where the appellant has made substantial deviations of a nature which were unforseen and unanticipated by the appellee; and, also, where the magnitude of deviation does not normally arise in such contracts, then we have no choice but to strike down the maximum price provision. To hold otherwise would not only be unjust, but also unconscionable, and such a result, this court cannot countenance.

The court is of the opinion that the law governing this particular contract is by no means novel. See: 17A C. J. S. *Contracts* § 371(3) (1963) wherein it is stated:

"Where the necessity for extra work results from the acts, errors, and mistakes of the architect or engineer of the owner, under whose supervision the work is to be done, the loss should fall on the owner, and the builder may recover

additional compensation, and this rule applies if the extra work is outside the original contract, although it provides that the contractor will not charge for extra labor.

"Additional compensation may be recovered for extra work which becomes necessary because the building cannot be constructed according to the plans and specifications furnished, as required by the contract, such as for alterations rendered necessary by defective plans, or for additional work or expense which is rendered necessary by the owner's negligence, or by his refusal to make timely suggested changes of the plans or failure to perform his part of the contract, . . ."

There have also been cases wherein the modification of a contract maximum price has been in issue. See: *Mathis* v. *Thunderbird Village, Inc.* (1964), 389 P. 2d 343, 236 Or. 425; *Opdyke & Butler* v. *Silver* (1952), 245 P. 2d 306, 111 Cal. App. 2d 912. On page 308, of the latter case, we quote:

"Respondents do not rely upon any evidence of express abandonment; but they say that abandonment may be implied from the acts of the parties. They quote from O'Loughlin v. Poli, 82 Conn. 427, 74 A. 763, 765, where the court said:

'. . . the parties to a written contract of the character of one under review are as free to alter it after it has been made as they were to make it, and all attempts on their part by its terms to tie up their freedom of dealing with each other will be futile. . . . To this end oral agreements will be as effective as written ones. . . . And implied agreements satisfactorily established will have all the force of express ones.'

"They quote further from the opinion of Justice Holmes written in Bartlett v. Stanchfield, 148 Mass. 394, 19 N. E. 549, 550, 2 L. R. A. 625, where that noted jurist said:

'. . . Attempts of parties to tie up by contract their freedom of dealing with each other are futile. The contract is a fact to be taken into account in interpreting the subsequent conduct of the plaintiff and defendant, no doubt. But it cannot be assumed, as matter of law, that the contract governed all that was done until it was renounced in so many words, because the parties had a right to renounce it in any way, and by any mode of expression, they saw fit. They could substitute a new

oral contract by conduct and intimation, as well as by express words.' (See, also, 66 A. L. R. 649, and Bavin & Burch Company v. Bard, 81 Cal. App. 722, 255 P. 200, and cases cited.)"

Appellant's next contention is that an owner is not liable for extra work that is furnished without the owner's ■ knowledge that the contractor expects to be paid.

It seems that it would only be reasonable to assume that the owner had knowledge of this, since he had made all of the aforesaid changes and modifications in the layout. It must have entered his mind that it may cost more than the contract maximum when completed.

In addition to this, the appellant in his brief sets out a condensed recital of the evidence which contains enough testimony to conclude that the owner had knowledge that the appellee should be recompensed for extra labor and rentals.

To quote from this condensed recital, we find Mr. Bunzendahl (appellee) testified to the effect that:

". . . I called Mr. Newquist, who was President of the Country Club at that time, and asked him if I couldn't come out there and talk to him, out to his house and talk to him. He said, 'Certainly, come on out.' I went out there and discussed the whole thing with Mr. Newquist. *I told Mr. Newquist that I couldn't continue under the present arrangement,* and that I felt that I was—that advantage was being taken of me, and that I felt like we weren't any nearer finished than what we were two weeks ago. I felt like it was just going to continue on this way.

"He said the only thing he knew to do would be to call a meeting of the board of directors and discuss the problem and see; and I said, 'Well, we've already run over in our daily time tickets and everything, and we've already run over $5,000.00,' which I said brought it up a little over $30,000.00; and I said, 'I don't know where we're going, but I can't go on.' So he said, 'Well, I'll call a meeting and see what can happen.' I think maybe on August 6, the night of August 6, he called a meeting, which I was present; Mr. Simmons was present; Mr. Regenstrief, Mr. Burke, Mr. Maxwell, Mr. Newquist, and I think that's all. We dis-

cussed this overage at that time, and it figured up to be somewhere in the neighborhood of $7,882.00, I think, over and above the original $25,000.00. *I told him I just couldn't go on and that something had to be done, or I had to have an assurance of what was going to happen, and that I was going to get paid for my services from now on in.* Mr. Regenstreif was opposed very much to paying me anything after he referred back to the contract, that I had a contract and that was it as far as he was concerned. Some of the other members of the board, Mr. Newquist, Mr. Maxwell— they asked Mr. Burke how much money had been spent on the golf course and what he figured had already been spent, and what he figured the total amount was going to run. He had some figures in there which I don't and what he figured the total amount was going to run. He had some figures there which I don't know, maybe they're around here someplace, and he had some figures; *and at that time Mr. Burke said we were going to finish up in a neighborhood of $4000.00 or $5000.00 less than w h a t he had originally planned on reason why part of or all of that money could not come to me, that they could allow me that much money.* Mr. Burke, Mr. Regenstrief, myself and Mr. Simmons knew that the golf course had not been completed. It had to be completed. We had several meetings after that. Mr. Simmons was present at the last meeting. Mr. Burke asked Mr. Simmons how long he thought it would take to finish the golf course. Mr. Newquist asked that question. Mr. Simmons said he didn't know how much time it would take. They said, 'Give us an answer. We've go to know tonight.' So Mr. Simmons sat down and figured out, and he outlined that it would take some ninety to one hundred thirty hours with the T. D. 14. Well, I think at that time he said it would take ten days to finish it; and Mr. Newquist said, I don't want the number of days; he said, 'Give me some idea, so we can figure up the cost that we're getting into. How much time will you need each piece of equipment?' And at that time Mr. Simmons gave them an estimate of ninety to one hundred thirty-five hours with the T. D. 14, ninety to one hundred thirty-five with a 955, and so many hours with the dump trucks; and he had so many more feet of ditch to dig. At that time, I think the total amount figured up somewhere around $5,800.00. That would be this equipment and time tickets for the next ten days. So they told me to go ahead and get the golf course done and they would meet in a meeting. *Mr. Newquist, who was president of the board, said to go ahead finish up the golf*

*course and we would set in the meeting, that all of the directors and me, would set in a meeting, and we would get together on what could be done for me,* which at that time that night agreed that I would go ahead and finish the golf course as outlined by Mr. Simmons." (Emphasis added).

Having found no error in appellant's second contention that the finding of trial court is not sustained by sufficient evidence, and is contrary to law, we must now turn to their first contention, to-wit: That the trial court erred in overruling the defendant's 'Motion for Venire De Novo.' The appellant, in its brief, cites the case of *Grossman et al.* v. *State* (1961), 241 Ind. 369, 172 N. E. 2d 576, which deals with the propriety of a motion for a venire de novo. Contained within said case we quote the following statement found on page 372:

"The purpose of the motion for venire de novo has been described as being to attack a verdict or finding where it is so defective, uncertain or ambiguous upon its face that no judgment can be rendered upon it, as may be the case with a general verdict or finding when there is a failure to find on all the issues for or against all the parties. Lowe's Indiana Practice, Vol. 3, § 58.2; 28 West's I. L. E., Trial, § 326."

From this quotation, it appears that the question presented us on this appeal is whether or not this finding is so defective, uncertain or ambiguous upon its face that no judgment can be rendered upon it.

We do know that the trial court found for the appellee (plaintiff) on his first paragraph of complaint. But what of the others? Paragraph two was based upon quantum meruit, thus being inconsistent with paragraph one, so it is clear the trial court could not have found on both paragraphs in favor of appellee. Therefore, a finding for the appellee on the first paragraph would mean a finding against him in the second. The third paragraph was based on a breach of the written contract with a prayer for damages. The fourth

asked for damage to a farm tractor furnished under the written contract.

The appellee contends that the trial court's failure to find on these remaining paragraphs can only mean but one thing: That the court found against the plaintiff (appellee) on said paragraphs. They are, in effect, waiving any rights to the action upon which those paragraphs are based.

Had the trial court found against the plaintiff (appellee) on the first paragraph of complaint and remained silent on the rest, we would have a different situation. It would be evident in that case that the plaintiff's rights were being prejudiced. However, in the case at bar, where the defendant (appellant) has not asked for any affirmative relief whatsoever, we are of the opinion no prejudice could accrue to the defendant (appellant) by the trial court's failure to find on the remaining paragraphs. The only prejudice that could prevail would be to the plaintiff (appellee), and it has waived any right to relief on those paragraphs.

Thus, we find that any error, if an error was in fact committed, by reason of the trial court's overruling of appellant's motion for a venire de novo, was harmless, and consequently would not require a reversal. We further find that appellant's motion to suspend consideration of this appeal and remand the case to the trial court pursuant to Rule 2-3, should be denied.

Appellant's motion to suspend consideration of the appeal and remand the cause for further action is now denied.

The judgment of the trial court is hereby affirmed.

Judgment Affirmed.

Mote, P. J., concurs.

Hunter and Smith, JJ., concur in result only.

NOTE.—Reported in 222 N. E. 2d 417.