William D. GORBETT, Appellant
(Defendant Below),

v.

Gilbert CLAYCAMP, d/b/a Claycamp
Excavating, Inc., Appellee
(Plaintiff Below).

No. 36A04–8811–CV–396.

Court of Appeals of Indiana,
Fourth District.

Sept. 14, 1989.

Thomas M. Barr, Nashville, for appellant.

Jeffrey J. Lorenzo, Seymour, for appellee.

CONOVER, Judge.

Defendant–Appellant William D. Gorbett (Gorbett) appeals the Jackson Superior Court's judgment awarding Plaintiff–Appellee Gilbert Claycamp, d/b/a Claycamp Excavating Co. (Claycamp) $3,000 with interest and costs as the amount due and unpaid for excavating a pond on Gorbett's real estate.

We reverse.

This appeal presents the following issues: whether the evidence was sufficient to show

(a) a modification of the original flat fee contract,

(b) consideration to support modification of the original agreement, and

(c) Claycamp was entitled to recover on the basis of an implied or quasi-contract.

In addition, Claycamp presents the following issue:

whether Gorbett would be unjustly enriched if he were not required to pay for Claycamp's additional work performed under the modification agreement.

Gorbett, considering the purchase of some land in Jackson County, discussed building a pond thereon with Claycamp, an experienced pond builder. At that time, Claycamp told Gorbett he could build a pond on the property for $3,000 at $1.50 per yard of earth moved and grade a nearby hillside for an additional· $1,000 to $1,500. Gorbett then arranged with Mike Cheatham from the local Soil Conservation Service (SCS) to study the ground and sketch a pond plan. He did so, then laid out the pond he proposed by setting flags outlining it on the property. Claycamp saw the flag marked area and agreed to build the pond for a $3,000 flat fee. It was to be 100 feet square and 12 feet deep. However, the SCS flags were removed later by the owner from whom Gorbett was purchasing the property.

When Claycamp moved his equipment onto the property to begin work, Gorbett replaced the missing flags substantially as they had been before removal. However, he changed the design several times by rearranging the flags as the excavation work was progressing. Gorbett's final design measured 100 feet by 200 feet by 12 feet deep. While rearranging the flags, Gorbett advised Claycamp he was "only going to do this once in a lifetime," and wanted it to look a certain way (R. 121).

While Gorbett believed Claycamp was doing the work for the original $3,000 figure, Claycamp believed he was doing it for either a per yard moved rate or an hourly equipment rental rate due to the changes Gorbett was making.

Gorbett never told Claycamp how many dollars he wanted to spend, nor advised Claycamp to stop building ·the pond, to build a smaller pond, or that he did not want to pay by the hour or by the cubic yard. Conversely, Claycamp never told

Gorbett he was proceeding on either a per yard or per hour rather than a flat fee basis. While the work was in progress, Gorbett daily would ask Claycamp regarding cost, "How are you running?" Claycamp would reply, "Yes. We're running alright."

Claycamp's final bill totalled $7,123.07, computed at the rate of $75 per hour for equipment rental. Gorbett paid him the agreed sum, but refused to pay more. From a judgment for Claycamp after a court trial, Gorbett appeals. Further facts as necessary appear later in this opinion.

■ The central thrust of Gorbett's issues is insufficiency of the evidence to support the trial court's judgment. When reviewing the sufficiency of the evidence in a civil case, we will decide whether there is substantial evidence of probative value supporting the trial court's judgment. We neither weigh the evidence nor judge the credibility of witnesses, but consider only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. Only if there is a lack of evidence or evidence from which a reasonable inference can be drawn on an essential element of the plaintiff's claim will we reverse a trial court. *Martin v. Roberts* (1984), Ind., 464 N.E.2d 896, 904; *F.D. Borkholder Co., Inc. v. Sandock* (1980), Ind., 413 N.E.2d 567, 569. The first question is whether there is substantial evidence showing the original flat fee contract was modified.

■ Because the modification of an existing contract is a contract in itself, all the required elements of a contract must be present. There must be a meeting of the minds and the assents of both parties to make any proposed modification binding and enforceable. *Burras v. Canal Constr. and Design Co.* (1984), Ind.App., 470 N.E.2d 1362, 1366.

■ The only discussion of cost of construction had by the parties after they had agreed on the $3,000 flat fee was described by Claycamp as follows:

Q. Okay. At that time, did you have any further discussion about money?

A. Not really, no. He, you know, he would ask me daily probably on the tractor, "How are you running?"

Q. With reference to dollars?

A. Yes, uh huh.

Q. And Mr. Barr in his opening statement indicated that you said that you were running about the right way.

A. Uh huh. That's right.

Q. And do you disagree with that?

A. I answered it "Yes, we are running all right with the fact that the cost per yard", because we were moving more yards. It was made clear that we were moving more yards and I was quite sure that Mr. Gorbett understood that we were moving more yards because we were making the pond bigger and he wanted it bigger and so the yards, you know, when I say, when I answered him, "Yes, we're running", we were actually moving the dirt per yard a little cheaper than the dollar and a half.

. . .

(R. 123–124). When Claycamp first viewed the property, he told Gorbett "to get anything decent at all he would have to spend at least $3,000.00 which is basically about two thousand yards." (R. 107A). The SCS plan estimated the volume to be removed at 2,012 cubic yards, at an estimated cost of $3,000. (R. 108). After the SCS plan was extant and staked on the property, the parties agreed to the $3,000 flat fee figure to build the pond.

The evidence is insufficient to show a modification of the original contract so as to permit Claycamp to recover more than the agreed flat fee, albeit the excavation was substantially larger than originally laid out.

Viewing the evidence in the light most favorable to the judgment, it is readily apparent Gorbett at all times believed Claycamp was doing the excavation work for the original $3,000 flat fee they had agreed upon, and was attempting to make sure the cost did not exceed that figure. Gorbett asked Claycamp every day "How are we

running?" referring to the "dollars" involved. Claycamp replied "Yes, we are running all right with the fact that the cost per yard" of $1.50 was not exceeding his original estimate.[1] These exchanges do not give rise to a reasonable inference Gorbett knew and understood Claycamp was proposing to change their flat fee agreement to a cost-per-yard method of determining the final cost of the project and was agreeing to Claycamp's proposed modification.[2]

In *Cleveland, etc. R.R. Co. v. Moore* (1907), 170 Ind. 328, 82 N.E. 52, 84 N.E. 540, one McNerney contracted with the railroad to grade right-of-way and lay track in a railroad yard and on several miles of the main line at a fixed price per yard of earth moved and at a fixed price per foot for track laid according to the railroad's plans and specifications. These fixed prices were substantially below the market at that time. The railroad made radical changes in the grade later but McNerney continued working for a time thereafter. He finally abandoned the project, and the railroad called upon his surety company to complete the project.

As the surety company carried the project forward, the railroad continued to make extensive changes to the work to be done in the railroad yard. The size of the yard was more than doubled, the grade was drastically altered, and a highway bridge overpass was eliminated, requiring the excavation of a subway underpass for the highway. Notwithstanding these gross deviations from the railroad's plans and specifications, the surety continued with the work until it too decided to abandon the contract. It then sued the railroad in *quantum meruit* for the extra earth moving it had done over and above the yards the railroad originally had estimated in the contract were to be moved. The judgment

for surety in the trial court was reversed on appeal. Our Supreme Court held upon the evidence the surety was charged with knowledge of part of the changes in the original plans, and that knowledge coupled with acquiescence on its part, and reliance on such conduct by the railway brought the claim for extras within the provisions of the contract in fixing the quantum of recovery, namely, the price per yard it fixed.

Likewise, in *Rebekah Assembly I.O.O.F. v. Pulse* (1910), 47 Ind.App. 466, 92 N.E. 1045, 94 N.E. 779, Pulse contracted to build a new building on the Lodge's land and a connecting covered passageway from there to an old building located on the same premises. The passageway was to be 90 feet in length, but the Lodge had a right to locate the new building. The site selected by the Lodge's building committee required construction of a passage 203 feet in length, more than double the length of the passageway shown in the plans. Pulse successfully sued the Lodge in the lower court under a claim the passageway's additional length was such a radical departure from the original plans his right to compensation should be determined without regard to the original contract's terms. In reversing, the appellate court said:

> If it were true that the appellant so radically changed the plans . . ., then the appellees were under no obligation to proceed with the work at all, and if they did proceed with it, without objection or question, leaving their employer to understand that they were proceeding in the work under the contract, they cannot after the work is done assert that the contract shall not determine their rights. . . . [I]t was their duty to have raised the [extra compensation] question before doing the work, and had it settled as provided such disputes should be settled by

1. When Claycamp and Gorbett first met at the proposed site, Claycamp estimated a $3,000.00 cost to construct Gorbett's pond because he would have to move 2,000 yards of earth at $1.50 per yard. After the SCS plan and its staking on the property, they agreed to a $3,000 flat fee for the project. Claycamp's response to Gorbett's daily inquiry could do nothing other than reinforce Gorbett's belief Claycamp was standing by the original agreement.

2. Claycamp's total bill to Gorbett was not calculated on a cost-per-yard basis, in the final analysis. His charges were calculated on a $75.00 per hour charge for heavy equipment rental and totaled $8,309.95, discounted (for no apparent reason) by 15% of the equipment rental figure for a net bill to Gorbett of $7,123.07. (R. 135).

their contract, and had the compensation fixed by agreement beforehand, and made a matter of writing. ... Here the principal subject-matter of the contract in question was the construction of a new building upon appellant's ground. The erection of the passageway between the new and the old buildings was but an incident in the major subject, and it was clearly in the contemplation of the parties that this passageway should be constructed wherever the new building might be located by the parties,

.        .        .        .        .

*Pulse*, 92 N.E. at 1046–1047. The same principles apply here even though the original contract was oral rather than written.

◼ Claycamp had an affirmative duty to raise the extra compensation question and have it settled before doing what he deems to be the extra work over and above that provided in the original contract. *Knab Co. v. St. Mary's Hospital, Inc.*, 286 F.2d 854, 861 (C.A. 7, 1961). Where a contract controls the rights of the parties, recovery cannot be had on the theory of *quantum meruit. Kincaid v. Lazar* (1980), Ind.App., 405 N.E.2d 615, 619; *Industrial Dredging & Engineering v. Southern Ind. Gas & Elec. Co.*, 840 F.2d 523, 525, (C.A.7, 1980). Absent a showing by Claycamp he raised the extra compensation question with Gorbett and had it settled before he did the extra work he claims was not covered by the original contract, the evidence is insufficient to support the judgment below. No such evidence appears here.

◼ Claycamp, however, argues a modification of the contract can be implied from the conduct of the parties, citing *Skweres v. Diamond Craft Company* (1987), Ind. App., 512 N.E.2d 217, 220–221; *Gorbett v. Estelle* (1982), Ind.App., 438 N.E.2d 766, 768; and *Connersville Country Club v. Bunzendahl, Inc.* (1966), 140 Ind.App. 215, 222 N.E.2d 417, 426. The rule regarding modification by conduct is well-stated in *Bunzendahl*. Modification of a contract may be implied from the conduct of the parties if the owner makes substantial deviations from the original contract of a na-

ture which are unforeseen and unanticipated by the contractor, or where the magnitude of the deviation does not normally arise in such contracts. *Bunzendahl*, 222 N.E.2d at 426.

◼ Here, the project concerned itself with the digging of a pond, and there were no substantial deviations from the SCS plan which were unforeseen and unanticipated by Claycamp. The variations in contour of the pond were made by Gorbett as the work was progressing and while Claycamp or his workers were present. As a result, Claycamp had actual knowledge of each deviation as it was staked by Gorbett on the property, but continued the excavation of the site without protest or objection. Thus, a modification by conduct cannot be implied from these facts.

Since the evidence is uncontradicted Gorbett paid Claycamp the money due under the original agreement, there is no reason for a new trial.

Reversed with instructions to enter judgment for Gorbett.

CHEZEM, P.J., concurs.

MILLER, J., dissents with opinion.

MILLER, Judge, dissenting.

I dissent. I believe the modification of the contract was implied by the conduct of the parties. The trial court's decision that the "flat fee" contract based on a "per yard" of dirt moved was modified by the owner's conduct of moving the stakes to encompass approximately twice the area originally contemplated was supported by substantial evidence. Questions regarding the modification of a contract are ones of fact, and are to be determined by the trier thereof upon the evidence in each case. *Skweres v. Diamond Craft Co.* (1987) Ind. App., 512 N.E.2d 217. On appeal, we neither weigh the evidence nor judge the credibility of the witnesses. *Id.* Therefore, we should affirm the trial court.

I agree with the majority that our case of *Connersville Country Club v. Bunzendahl, Inc.* (1966), 140 Ind.App. 215, 222 N.E.2d 417, governs our analysis of wheth-

er the modification of the contract was implied by the conduct of the parties. In *Bunzendahl*, the contractor agreed to build a 9–hole addition to a golf course according to specifications agreed upon and staked out. The contract contained a maximum price provision. The owner's architect-engineer made substantial changes in the layout and construction from that originally contemplated. We held that because the changes were of a nature which was unforeseen and unanticipated by the contractor and the magnitude of the deviations did not normally arise in such contracts, the parties had modified the contract to such an extent that it was equitable that the maximum price provision be also modified. In reaching this conclusion, we noted:

> It appears that the [contractor] used these sketches and stakes upon which to base his estimates of labor, machinery and time necessary to complete the contract. It is common knowledge that such procedure is common in the building and construction industry. Surely, one could not enter into a contract which set a maximum price unless he was confident he could perform the terms of the contract and make at least a small profit for his time and trouble. By virtue of the [owner's] architect-engineer making significant changes in the layout and construction of the new course as agreed to by the parties, (as well as some on the old nine hole course), we find that [the owner] and [the contractor] modified the contract to such an extent that it is equitable that the maximum price provision be also modified.

If we were to accept [the owner's] position and argument, the [owner] could theoretically be entitled to a golf course which could run from Connersville to Indianapolis, and at a price not to exceed the maximum stated in the contract. This is an absurd deduction, but where do we draw the line? We do not intend to state a hard and fast rule which can be applied in every case, for each case has its special circumstances, but it is clear that in this case where the [owner] has make substantial deviations of a nature which were unforeseen and unanticipated by the [contractor]; and, also, where the magnitude of deviation does not normally arise in such contracts, then we have no choice but to strike down the maximum price provision. To hold otherwise would not only be unjust, but also unconscionable, and such a result, this court cannot countenance.

\*     \*     \*     \*     \*     \*

[The Owner's] next contention is that an owner is not liable for extra work that is furnished without the owner's knowledge that the contractor expects to be paid.

It seems that it would only be reasonable to assume that the owner had knowledge of this, since he had make all of the aforesaid changes and modifications in the layout. It must have entered his mind that it may cost more than the contract maximum when completed. *Id.* 140 Ind.App. at 228–230, 222 N.E.2d at 426, 427.

I believe that the facts of the present case militate more towards a finding of an implied modification by conduct than the facts of the *Bunzendahl* case. In the present case, the $3,000.00 estimate was simply the product of a rate and the area to be dug (2,000 cubic yards at $1.50 per yard). The essence of the contract was the area of dirt to be removed. The owner, by rearranging the staked off area, doubled the amount of dirt to be removed. In the *Bunzendahl* case, the parties had contracted for a variety of contracting services and agreed to a price cap, a maximum price for all the services to be provided.

In the present case, the $3,000.00 contract price was agreed upon with reference to moving 2,000 yards of dirt. By moving the stakes, Gorbett doubled the amount of dirt to be removed. The magnitude of deviation is significant. Claycamp could not have anticipated, at the time of the original contract, that Gorbett would double the size requirement. Such a deviation does not ordinarily arise in such a contract.

Finally, as in *Bunzendahl*, we must assume the owner had knowledge the con-

tractor expected to be paid for the extra work. When Gorbett asked "how are you running?," Claycamp would answer "Yes, we are running all right with the fact that the cost per yard." (R. 123–124; *see* a more expanded quote of the record in the majority opinion) It would appear to me, as it did to the trial judge, that Claycamp was making it clear that because more dirt was being removed than was anticipated in the contract, a larger bill was accruing. Because the cost of project was computed by the area of dirt to be removed, and the area to be removed was doubled, we should assume Gorbett anticipated he was running up a larger tab than that set by the original contract.

Gorbett's position suggests he would be entitled to stake out a pond many times larger than the original plan and expect to pay the price set by the original contract. However, as in *Bunzendahl*, we must draw the line. We should find that the doubling of the prospective pond dimensions obliterates that line. Under the authority of *Bunzendahl*, we should affirm the trial court's decision that the price provision of the contract was modified along with the area of the prospective pond dimensions. To hold otherwise would not only be unjust, but also unconscionable, and this court should not permit such a result.

Therefore, I dissent.