**THE BLAKLEY CORPORATION, Appellant–Defendant,**

v.

**EFCO CORPORATION, Appellee–Plaintiff.**

No. 49A05–0512–CV–697.

Court of Appeals of Indiana.

Aug. 31, 2006.

Sydney L. Steele, Reynolds B. Brissenden, Kroger Gardis & Regas, LLP, Indianapolis, IN, Attorneys for Appellant.

Robert S. Schein, Libby Y. Mote, Matthew R. Strzynski, Krieg DeVault LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

### Case Summary [1]

The Blakley Corporation ("Blakley") appeals from the trial court's denial of its motion to correct error in a breach of contract case. Blakley requested that the trial court amend its findings of fact and conclusions thereon by addition of an award to Blakley of markup damages against EFCO Corporation ("EFCO") totaling $76,755.00. By way of cross-appeal, EFCO calls into question the trial court's determination that it was liable for breach

---

[1.] Oral arguments were heard August 10, 2006, in the Indiana Court of Appeals court-room. We thank counsel on both sides for their arguments.

of contract, resulting in damages to Blakley in the amount of $307,020.00. We conclude that EFCO has failed its burden of establishing that the evidence does not support the trial court's determination of liability. We also conclude that the trial court sufficiently addressed markup damages when it twice rejected Blakley's claim to them. We therefore affirm.

### Issues

Blakley raises two issues for review, which we consolidate and restate as whether the trial court sufficiently addressed the matter of Blakley's entitlement to a twenty-five percent markup on damages awarded by the trial court due to EFCO's breach of contract. EFCO cross-appeals on the issue of its liability for damages.

### Facts and Procedural History [2]

Blakley and EFCO entered into a purchase order agreement during the construction of the Indiana State Museum. Blakley, a subcontractor responsible for the installation and erection of exterior curtain wall,[3] windows, and interior storefront glass, ordered the fabrication and delivery of aluminum curtain wall and window frame materials from EFCO. On February 24, 2000, prior to any agreement between the parties, structural drawings were sent to EFCO regarding the curtain wall. On or about March 27, 2000, EFCO submitted a bid to Blakley for this portion of the project based on a standard curtain wall product fabricated by EFCO. Prior to submitting its proposal, EFCO did not review the project's structural drawings, which included deflection requirements.[4]

Several months later, in August of 2000, EFCO's engineering department first reviewed the deflection requirements in the structural drawings in order to produce shop drawings for a deadline of August 29, 2000. It became clear to EFCO that the deflection requirements in the structural drawings far exceeded the capabilities of the standard product EFCO had bid to Blakley. EFCO also claims to have discovered a conflict between the architectural and structural drawings at this time. EFCO failed to notify Blakley of either issue. Because the shop drawings were incomplete and contained incorrect details, aside from the issue of deflection requirements, EFCO missed the deadline for the shop drawings.

EFCO communicated with Blakley regarding the deflection requirements by a letter dated September 14, 2000, which requested clarification of an up/down arrow placed in front of deflection values in the structural drawings. EFCO did not apprise Blakley of any apparent conflict between the requirements and its standard product, or between the architectural and structural drawings. Blakley responded by a letter dated September 18, 2000, in which it also offered to coordinate a meeting between EFCO and the architect to discuss outstanding issues. EFCO declined, and later submitted shop drawings on September 29, 2000, one month late. Blakley, EFCO, and the architect met to review the shop drawings, which accommodated the deflection requirements. Deflection was not discussed during the meeting, and the shop drawings were returned to EFCO in early December for revision.

EFCO did not follow the contractual procedure for requesting a change in the structural or aesthetic requirements of the curtain wall system. On January 19, 2001,

---

**2.** EFCO's Motion For Leave To File Supplemental Appendix is granted.

**3.** Curtain wall is traditionally an aluminum and glass framing system used to enclose a large-scale building, protecting it from the elements. Transcript at 358.

**4.** Deflection is a bending or distortion of a structural support member. Tr. at 358.

EFCO made its first mention to Blakley that its standard system would deviate from the project's aesthetic requirements. EFCO considered this letter a request for modification of aesthetic and/or structural specifications. The project architect responded on January 25, 2001, requesting further details on the proposed modifications, and offering to hold a phone conference. EFCO did not pursue the phone conference, and made no attempt to contact the architect before submitting the revised shop drawings on February 9, 2001. Without explanation, EFCO included proposed modifications to the structural and aesthetic requirements. The architect replied on February 26, 2001, again telling EFCO that it needed to explain the proposed modifications, or else he could not respond to EFCO's suggestion that the museum's structural frame be redesigned to support EFCO's standard product, which did not meet the deflection requirements in the project specifications. Blakley and the architect requested that EFCO meet with them to discuss the deflection issues and finalize the shop drawings. EFCO did not do so.

Instead, on March 7, 2001, EFCO sent Blakley a letter including a detailed explanation of its concerns over the deflection requirements as well as proposed modifications. As a result, the architect requested that the project engineer recalculate the deflection requirements. Although not all deflection requirements were reduced to accommodate EFCO's product, the project engineer relaxed some of the deflection criteria of the original structural drawings because EFCO's standard curtain wall system would not meet the specified requirements, and not because these criteria were shown to be incorrect. By early April of 2001, the deflection concerns were resolved.

On April 11, 2001, EFCO signed the purchase order with Blakley, which included delivery dates in May and July of 2001. By May of 2001, the project had progressed to the point where Blakley could begin installing curtain wall. Despite the commitment it had made a month earlier by signing the purchase order, EFCO failed to deliver materials in May of 2001. Blakley reduced the scope of EFCO's responsibilities by taking on aspects of the project itself, hoping to expedite delivery of curtain wall materials. In June of 2001, Blakley was instructed to obtain expedited delivery from EFCO to keep the project on schedule. Blakley demanded firm delivery dates. On June 8, 2001, EFCO faxed a handwritten page including delivery dates later than those previously agreed upon, ranging from July to September of 2001. EFCO later testified that its scheduling department had committed to those dates. Blakley relied on these delivery dates in providing an erection schedule for the curtain wall portion of the project.

EFCO missed all the delivery dates as revised in the June 8 fax, although two of the deliveries were made close to the scheduled dates. Of those materials shipped close to the delivery dates, the entire first delivery contained misfabricated pieces, requiring Blakley to perform modifications in order to use them on the project. EFCO gave Blakley notice in late August of 2001 that it would not meet the revised delivery dates. Without explaining further, EFCO pushed late August and early September deliveries back to October, and was unable to provide shipment dates for other portions of the curtain wall. On September 10, 2001, EFCO's president sent Blakley's president a revised shipment schedule providing that all curtain wall materials would be delivered in October of 2001. Blakley received all remaining materials within a four-week period beginning in mid-October of 2001. Due to

the manner of EFCO's performance, Blakley incurred additional expenses for fabrication, field installation, and equipment. Blakley also incurred additional labor expenses due to compression of the curtain wall installation timeframe in order to mitigate the impact upon the larger project's schedule.

In July of 2002, EFCO filed suit against Blakley to recover the unpaid balance of the purchase order price, stipulated by the parties to be $229,879.80. Blakley counterclaimed that EFCO breached the purchase order by failing to timely deliver materials and by providing defective materials, thereby causing Blakley to incur damages exceeding the unpaid balance of the purchase order price.

Prior to a bench trial, the parties requested that the trial court issue written findings of fact and conclusions upon its judgment. Both parties filed proposed special findings. The trial court adopted in large part Blakley's proposed findings and conclusions, but omitted its proposals on Blakley's damages relating to a twenty-five percent markup on costs representing overhead and profit. Concluding EFCO's late deliveries and fabrication errors resulted in a failure to meet its obligations under the purchase agreement, which caused Blakley to incur unanticipated costs, the trial court entered judgment in favor of Blakley in the amount of $307,020.00, offset by the outstanding amount due under the purchase agreement.

Blakley filed a timely motion to correct error, asking the trial court to amend its findings and conclusions to address Blakley's claimed markup damages, an amount totaling an additional $76,755.00. The trial court summarily denied Blakley's motion, and Blakley now appeals. EFCO cross-appeals on the issue of its liability for breach of the purchase agreement.

*Discussion and Decision*

Because the issue of liability for damages raised by EFCO on cross-appeal may preclude consideration of Blakley's claim for markup damages, we first consider EFCO's argument. When the trial court enters specific findings and conclusions with respect to a final judgment, we apply a two-tiered standard of review. *S.C. Nestel, Inc. v. Future Constr.*, Inc., 836 N.E.2d 445, 449 (Ind.Ct.App.2005). We first address whether the evidence supports the findings, and then whether the findings support the judgment. *Id.* The trial court's findings and conclusions will be set aside only if they are clearly erroneous. *Id.* A judgment is clearly erroneous when a review of the record indicates that it contains no facts or inferences supporting the trial court's findings and conclusions, therefore leaving us with a firm conviction that a mistake has been made. *Id.* We do not reweigh the evidence or reassess witness credibility, but consider only the evidence most favorable to the judgment. *Id.* However, where a pure question of law is involved, our standard of review is de novo. *Id.*

EFCO cross-appeals from a negative judgment. A party who had the burden of proof at trial appeals from a negative judgment and will prevail only if it establishes that the judgment is contrary to law. *Helmuth v. Distance Learning Sys. Ind., Inc.*, 837 N.E.2d 1085, 1089 (Ind.Ct.App.2005). A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead only to one conclusion, but the trial court reached a different conclusion. *Id.*

## I. EFCO's Liability for Damages

EFCO asserts that the trial court erred in finding it liable for breach of contract.

Specifically, EFCO claims that any delays in its performance were solely attributable to defects in the design plan and specifications of the project, as established by evidence at trial. EFCO couples this argument, which essentially calls into question the sufficiency of the evidence supporting the trial court's decision, with an argument that the trial court should not have relied on federal case law to make the liability determination.

## A. Evidence

■ EFCO asserts it "established that any delays in EFCO's performance were attributable solely to the faulty plans and specifications of the State, the Architect, and Engineer of Record on the Project." Appellee's Brief at 13. It bases this claim on its price quotation to Blakley prior to the purchase agreement. The quotation "contained an express qualification that maximum allowable live and dead load building deflection must not exceed +/-¼"[5] despite the fact that the project specifications included a value beyond this limitation of EFCO's standard curtain wall product. Appellee's Reply Brief on Cross–Appeal at 1.

EFCO asserts that it was required to modify details of its standard curtain wall system, which it used in the pricing quotation to Blakley, because the deflection values exceeded plus or minus a quarter inch throughout the structural drawings it was given. *Id.* EFCO also points to the resulting conflict between the architect's aesthetic requirements and the engineer's structural requirements with regard to the curtain wall, arguing that in pleasing one it could not satisfy the other, thus making compliance with the project specifications impossible. According to EFCO, the modifications and the discrepancy between

requirements resulted in a delay in the production of shop drawings used in fabrication and building curtain wall for shipment to Blakley until after "the Engineer of Record finally recalculated and corrected the deflection values." *Id.* at 2. EFCO blames the project specifications and requirements as solely responsible for its delayed performance, arguing that it should not bear the costs resulting from the delay. We disagree.

The evidence available to the trial court sufficiently supported its determination that EFCO bore responsibility for delays in its performance. To start, testimony of EFCO employees established that EFCO had not reviewed the deflection requirements prior to submitting its proposal for use of a standard curtain wall product. Appellant's Appendix at 16–17. This point was conceded by EFCO during oral argument, when EFCO explained that its policy is to not review project specifications prior to its bid.

Secondly, EFCO did not establish that the deflection values were erroneous or defective. Rather, the project engineer explained that the deflection requirements of the original structural drawings "were based upon conservative calculations of loads with [a] substantial safety factor built in to the calculation." *Id.* at 35. EFCO did not show that this built-in factor made the calculations defective, or prove that it was objectively impossible for industry suppliers to meet these requirements. *Id.* at 36. The trial court found that the project engineer "did not change the deflection requirements because [they] ... were incorrect," but rather relied on his testimony that the deflection criteria were relaxed to accommodate EFCO,

5. Live load is non-stationary load, such as furniture, people, or other movable objects. Dead load is the result of building materials

or permanent objects that remain in the structure. Tr. at 358–59.

whose standard product would not otherwise meet the specifications. *Id.* at 26.

Thirdly, as conceded by EFCO during oral argument, it did not follow the contractually designated procedure for suggesting modification of the perceived inadequacies of the deflection requirements, even after it was aware that the values were beyond the performance capabilities of the standard product it had bid to Blakley. In fact, once EFCO raised its concern about the deflection values during the shop drawing process, it failed to clearly explain these concerns and the need for modification of the structural specifications. It also rejected consultation offers from Blakley and the project architect, which may have clarified matters sooner.

Lastly, EFCO agreed to the first set of delivery dates as included in the purchase order after the deflection issues were resolved. Yet, it failed to meet these deadlines. It likewise failed to meet a second set of delivery dates arranged with Blakley by fax on June 8, 2001, and also delivered misfabricated materials. *Id.* at 26–28.

As such, we cannot say that the evidence and inferences lead only to one conclusion, which is different than that reached by the trial court. Rather, sufficient evidence exists to support the trial court's determination that EFCO's delayed performance was not solely caused by defects or errors in the design plan or specifications of the project. We decline EFCO's invitation to reweigh the evidence in its favor.

### B. Authority

EFCO also argues that the legal conclusions regarding its liability are entitled to no deference because "[t]he only authority relied on by the trial court for its decision to hold EFCO liable for breach of contract, irrespective of any defects in the Project's plans and specifications, were federal cases having no precedential value...." Appellee's Br. at 13, 15. Our de novo standard of review reflects that we approach questions of law without deference to the trial court. *S.C. Nestel, Inc.*, 836 N.E.2d at 449.

First, we note that the trial court relied on Indiana law holding that "[a] contractor has a duty to discover defects in plans or specifications, that are reasonably discoverable or patent, and to warn the contractee or architect of the defects, even if the plans and specifications are supplied by the contractee." *St. Paul Fire & Marine Ins. Co. v. Pearson Constr. Co.*, 547 N.E.2d 853, 858 (Ind.Ct.App.1989), *trans. denied.* Moreover, where no Indiana cases adequately address the issues involved in a case, decisions of other jurisdictions may be instructive. *See Associated Truck Lines, Inc. v. Pub. Serv. Comm'n of Indiana*, 492 N.E.2d 704, 713 (Ind.Ct.App. 1986) (explaining that where no Indiana case law is on point our courts have looked to federal cases as persuasive authority). For instance, as Blakley points out, the trial court acknowledged the "general rule in government contracting ... that whenever the government uses specifications in a contract, there is an accompanying implied warranty that these specifications are free from errors." Appellant's App. at 38 (citing *Conner Bros. Constr. Co. v. United States*, 65 Fed.Cl. 657, 683 (2005)).

EFCO instead cites *United States v. Spearin*, 248 U.S. 132, 136, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918), for the proposition that where a contractor must build according to plans and specifications of an owner, the contractor will not be responsible for the consequences of defects in the plans and specifications, even though the contractor is required to check the plans and inform itself of the require-

ments.[6] We note, however, that EFCO failed to establish that its delayed performance was a consequence of defects in the project plans and specifications. As such, EFCO's reliance on *Spearin* is misplaced because it is inapplicable under the present circumstances.

EFCO also asserts that the federal cases relied upon by the trial court are distinguishable. EFCO argues that "most of the cases cited" by the trial court arose in the context of the Federal Acquisition Regulations, which contain "specific provisions governing excusable delay clauses in federal contracts," and that many of these cases involved secondary review of rulings made by administrative boards in actions brought against the federal government. Appellee's Br. at 13–14. Alternatively, EFCO relies on Indiana cases in positing that where extra work " 'results from the acts, errors, and mistakes of the architect or engineer of the owner, under whose supervision the work is to be done, the loss should fall on the owner.' " *Id.* at 11 (quoting *Connersville Country Club v. Bunzendahl, Inc.*, 140 Ind.App. 215, 228–29, 222 N.E.2d 417, 426 (1966) and citing *Allied Structural Steel Co. v. Indiana*, 148 Ind.App. 283, 294, 265 N.E.2d 49, 56 (1970)).

Again, EFCO failed to establish that the additional costs incurred by Blakley were the result of defects in the design plan and specifications attributable to the project architect or engineer. Further, the cases cited by EFCO are no more instructive than those upon which the trial court relied. Indeed, EFCO points to these cases as dealing generally with subcontractor liability, and not as relevant to pertinent issues addressed by the trial court, such as excusable delay in performance of con-

struction contracts, the result of a mistake in a subcontractor's bid, the duty of a contractor to review relevant contract documents, a contractor's duty to investigate or inquire about ambiguity, inconsistency, or mistake in specifications, and reliance by the subcontractor in a claim of defective specifications. Appellant's App. at 36–39.

Consequently, the trial court did not err when it found federal case law instructive with regard to the issues presented.

## II. Markup Damages

■ Blakley alleges, and EFCO does not dispute, that Blakley requested a twenty-five percent markup on its costs, submitted evidence in support of this amount, and included the issue in its proposed findings of fact and conclusions of law. Therefore, the only issue on appeal is whether the trial court erred in failing to expressly address this claim in its final judgment.

The parties requested, under Indiana Trial Rule 52(A), that the trial court issue findings of fact and conclusions thereon. The parties submitted proposed findings and conclusions, of which the trial court in large part adopted Blakley's. The findings and conclusions not adopted from those proposed by Blakley were related to its claim for twenty-five percent markup on costs. Blakley therefore requested amendment of the trial court's findings pursuant to Trial Rule 52(B), which permits the trial court to amend findings and enter judgment where "special findings of fact required by [Rule 52] are lacking, incomplete, inadequate in form or content or do not cover the issues raised by the pleadings or evidence." The trial court denied Blakley's request without explanation.

---

**6.** This is commonly referred to as the Spearin Doctrine, which differs from the Indiana case law recognized by the trial court in *St. Paul* *Fire & Marine* imposing a duty on contractees to discover and disclose defects in plans or specifications.

Blakley characterizes the evidence as uncontroverted with regard to the markup damages, while EFCO points to the following testimony of an expert witness:

Q[:] Again, you tested that figure and from an accounting perspective you were okay that Blakley was using 25% based on your review of the profits set out in the estimate, correct?

A[:] I don't know if I would agree with the way you've just stated that, sir. I don't think I tested it, and I certainly didn't do any accounting review as to what Blakley's historic markups would or would not be. I do believe that their bid had a 25% markup so I did do that much to see whether there was some validity to using the percentage, and there was some basis and the basis comes from their bid.

Q[:] Deposition page 112, let's see if we can cut through this. Question: Markup, 25%, no real heartburn? Answer: As to the methodology used to arrive at it as to whether or not it's truly owed as opposed to just costs, that's a different issue. Did I read that correctly?

A[:] You did.

Tr. at 568–69. Blakley argues this testimony supports its claim for markup damages, while EFCO argues that it shows a twenty-five percent markup may not be justified under the circumstances of this case.

As stated above, the trial court uses its discretion in assigning weight to the evidence and assessing a witness's credibility, to which we grant deference. *S.C. Nestel, Inc.,* 836 N.E.2d at 449. Here, the trial court heard testimony on the matter, and chose to omit Blakley's proposed findings and conclusions that it was entitled to damages in the amount of a twenty-five percent markup on its costs. By its mo-

tion to correct error, Blakley afforded the trial court a second look at the weight it accorded the testimony regarding markup damages, and its subsequent refusal to assess them. The trial court denied Blakley's motion. In combination, this is enough on the part of the trial court to signal its intent with regard to the matter of markup damages. Simply put, it appears that on the evidence the trial court was not convinced Blakley established its entitlement to the twenty-five percent markup on costs. We decline to reweigh the evidence or reconsider witness credibility.

As a final note, the damages awarded Blakley were sufficient to cover the costs it incurred as a result of EFCO's breach. Awarding an additional twenty-five percent would go beyond making Blakley whole. We acknowledge Blakley's argument that this markup included overhead costs as well as profit. The problem is that the two were not clearly defined. Had overhead costs associated with EFCO's breach been separately established, Blakley may have recovered those costs. Nevertheless, because profit and overhead were lumped together into one figure, we cannot say Blakley was entitled to an amount exceeding that which makes it whole.

*Conclusion*

Sufficient evidence supports the trial court's determination that EFCO is liable for breach of the purchase order agreement with Blakley, and the trial court properly considered federal law in reaching this conclusion. Furthermore, the trial court adequately addressed the matter of Blakley's claimed damages amounting to twenty-five percent markup on the costs incurred as a result of EFCO's breach, and concluded that Blakley was not entitled to

these damages. We therefore affirm the trial court's ruling in all respects.

Affirmed.

SHARPNACK, J., and NAJAM, J., concur.