ALLIED STRUCTURAL STEEL CO. v. STATE OF INDIANA.

[No. 769A117. Filed December 29, 1970. Rehearing denied February 2, 1971. Transfer denied May 14, 1971.]

*Richard D. Wagner, Harold L. Folley, Krieg, DeVault, Alexander & Capehart,* of counsel, of Indianapolis, *Moore, Costello & Hart,* of St. Paul, Minnesota, for appellants.

*Theodore L. Sendak,* Attorney General, *Murray West,* Deputy Attorney General, for appellee.

SULLIVAN, J.—In a suit for "extra" work performed under a building contract with the State of Indiana, appellant, the assignee contractor appeals from an unfavorable judgment in the Superior Court of Marion County, sitting en banc as a court of claims.

The facts most favorable to the appellee indicate that in 1962, Industrial Construction Company entered into a written agreement with the appellee, State of Indiana, through the Indiana State Highway Commission, for the construction of substructures for a bridge across the Ohio River between Evansville, Indiana and Henderson, Kentucky. In 1963, Industrial, with appellee's assent, assigned its interest to the appellant, Allied Structural Steel.

The contract itself provided for the construction of five piers, two of which were to be located in the river. Each pier was to be founded on bedrock and constructed in accordance with plans and specifications included in the contract or as otherwise specified by the 1960 State Highway Department of Indiana Standard Specifications, which were incorporated into and made a part of the agreement.

The source of appellants' claim here was the construction of Pier C, one of the two piers located in the river. Under an option in the contract, Pier C could be constructed by either the "caisson" or "cofferdam" method, with the majority of work under either method to be completed under water. Appellant chose the cofferdam method, and according to plans it submitted, interlocking 110 foot corrugated sheets were driven to bedrock so as to form a rectangular enclosure around the foundation. The cofferdam was to provide "quiet water" around the project and prevent the influx of silt and other river matter into the construction area.

During the spring of 1963, appellant, upon the State's determination of final elevation for the foundation, blasted and "chipped" away layers of rock down to the prescribed elevation. The bedrock was then cleaned by the appellant pursuant

to contract and inspected by divers employed by the State. Both a water jet and a suction device were then used to keep the jagged foundation clean. Twelve million pounds of special concrete were then poured under water upon the foundation, which upon hardening, formed a "seal" or base, 26 feet wide by 66 feet long by 36 feet high, upon which Pier C's share of the weight of the bridge was to rest. Two inch core samples were taken through the hardened steel, as provided by the contract, to demonstrate the sufficiency of the seal concrete and the seal-bedrock jointure. Analysis of these samples showed voids or lack of recovery in a majority of the cores ranging from three inches to three feet. Subsequently, appellant was ordered to demonstrate the sufficiency of the seal-bedrock jointure, and "split-spoon" samples were taken. Upon failure to provide satisfactory proof of the jointure appellant was ordered to remedy the situation. A method of pressurized grouting of the jointure was agreed upon and appellant, under protest, undertook the remedy. Six inch core samples were then taken, and the results were accepted by the appellee.

In 1968, the appellant instituted a claim against the State in the amount of $194,665.29 plus interest for extra work and delays caused by the difficulties with Pier C. The Marion County Superior Court, siting en banc as a court of claims, entered judgment for the defendant based upon forty-eight special findings of fact.

Appellant objects to seventeen of the forty-eight findings. We, however, address ourselves only to those which are not duplicitous and which are supported by legal argument.

## "PROOF" PROVISION IS NOT AMBIGUOUS NOR IS ITS ENFORCEMENT UNCONSCIONABLE

The initial argument of the appellant is that enforcement of the dictates of Section 13 of this contract caused an unconscionable burden to fall upon it as contractor. The critical provisions of Section 13 are set forth as follows:

"13.  CAISSONS AND COFFERDAMS.  * * *

                    *    *    *

If the Contractor elects to use Cofferdams for the construction of Piers B and C and Pier A-Alternate X, he shall give particular attention to the final cleaning of the bedrock foundation so that all silt and debris shall be removed prior to pouring the foundation seal concrete.

To assure that the quality of the steel concrete is satisfactory and that there is *no unsuitable material causing separation of the seal concrete from the bedrock,* the Contractor shall drill cores not less than 2 inches in diameter through the seal into the bedrock.

A minimum of 12 cored holes shall be drilled in each of the foundations * * * In case of any *questionable material* or *separation of seal* from bedrock, additional cores shall be drilled to determine the area or volume involved.

An unsatisfactory quality of seal concrete or *separation of the seal concrete from the bedrock by any unsuitable material* may be cause for rejection of the seal concrete. Removal and replacement of the seal concrete shall be done at no additional cost to the State."  (Emphasis supplied)

It is the contention of the appellant that the terms "questionable material" and "unsuitable material" with reference to an acceptable jointure of bedrock and seal concrete are undefined, misplaced, and misleading, and that accordingly there was no meeting of the minds regarding that provision of the contract.

We would affirm the well-stated principle of contract interpretation that contracts must be given such reasonable construction as will give them effect, of possible, according to the parties' intention. *L & G Realty & Const. Co.* v. *City of Indianapolis* (1957), 127 Ind. App. 315, 139 N. E. 2d 580. It appears the clear intent of the State in its choice of contractual language was to assure conformance to plans and specifications for the substructure project. With deliberateness Section 13 was drafted to point out the expectations of the State concerning the very critical seal-bedrock jointure, and the requirement that there be no separation

between the seal and bedrock was emphasized in four successive paragraphs of that section.

Appellant's contention of ambiguity becomes considerably less tenable when the whole of the contract is considered as to the genuine intent of the parties. The true meaning of a contract is to be ascertained from a consideration of all its provisions, and a liberal or technical construction of an isolated clause should not be indulged to defeat the true meaning. *Sindlinger* v. *Department of Financial Institutions* (1936), 210 Ind. 83, 199 N. E. 2d 715; *Elliott* v. *Travelers Insurance Co.* (1951), 121 Ind. App. 400, 99 N. E. 2d 274; *McClain's Estate* v. *McClain* (1962), 133 Ind. App. 645, 183 N. E. 2d 842; *General Insurance Co. of America* v. *Hutchison* (1968), 143 Ind. App. 250, 239 N. E. 2d 596.

Within the contract here considered are numerous references to suitable and unsuitable material. In Section 14, with reference to core samples taken preliminary to selection of a final elevation for the foundation, it was provided that:

> "In the event that the rock cores * * * indicates unsound rock, soft layers of shale, *layers of clay, or other soft material* beneath the top layer or ledges of the rock *which is unsuitable for the pier foundation* in the opinion of the Engineer, the Contractor shall excavate the layers of rock and the unsuitable material down to sound, solid rock * * *" (Emphasis supplied)

In other reference to the desired foundation material it was provided that:

> "If any of the rock cores [preliminary to selection of the final elevation] * * * do not indicate sound, solid rock, * * *, the Contractor shall continue drilling * * * until he has cored not less than five (5) feet into a solid rock foundation material * * *
>
>     *   *   *
>
> If the rock cores as specified above indicate that a suitable foundation level has been reached, the footing area shall be cleaned* * * If the rock cores indicate unsuitable foundation material below the level of the caisson or cofferdam, such unsuitable material and layers or ledges of rock shall be removed * * *"

Again, in reference to the driving of caisson piles[1] the nature of "unsuitable material" was indicated:

"Caisson piles shall be driven or drilled-in to bedrock * * * [l]ayers or ledges of rock which are underlain by *soft materials* such as *clay, silt, soft shale or other unsuitable foundation material* shall be [excavated] * * *" (Emphasis supplied)

The unambiguous definition of unsuitable material was again affirmed with regard to the contractor's duty to supply adequate core samples:

"If *seams, cavities, soft layers of mud, clay, shale or other unsuitable foundation material* are found * * *, drilling shall be continued * * *" (Emphasis supplied)

A later provision concerning approval of caisson pile drillings[2] made repetitious the clarity of the contractual proscription against unsuitable material:

"* * * the interior of the caisson pile drilling shall be inspected for *crevices, seams, cavities or soft material in the rock.* If such *unsuitable material* is found, the Contractor shall drill * * * farther into the rock * * * (Emphasis supplied)

Upon consideration of the ample contractual references to the nature of unsuitable material we are forced to conclude that reasonable men would necessarily find the various terms describing acceptable foundation material are neither misleading nor ambiguous, and that a singular and clear meaning of such terms were within the contemplation of both parties.

The appellant, however, further couches his unconscionability argument in terms suggesting that he was required to provide without compensation sufficient labor and materials to

---

1. It should be noted that while appellant did not here employ the caisson construction method, the unquestionable requirement of the State, regardless of the construction method used, was that a foundation must be free of unsuitable materials.

2. See Footnote 1, *supra.*

meet an unforeseen contingency. In support of his contention appellant relies heavily on the recent case of *Connersville Country Club* v. *F. N. Bunzendahl, Inc.* (1966), 140 Ind. App. 215, 222 N. E. 2d 417. In that case the contractor had agreed to furnish equipment and labor for construction of a golf course in accordance with the owner's plans. During the course of construction the owner altered the plans, causing the extra work for which he refused, under a maximum-payment contractual provision, to pay compensation. In holding for the contractor the opinion stated what we believe to represent the prevailing rule in Indiana.

"* * * We do not intend to state a hard and fast rule which can be applied in every case, for each case has its special circumstances, but it is clear that in this case where the *appellant has made substantial deviations* of a nature which were *unforeseen* and *unanticipated* by the appellee; and, also, where the magnitude of deviation does not normally arise in such contracts, then we have no choice but to strike down the maximum price provision. * * *" (Emphasis supplied) 222 N. E. 2d 417, 426.

We would agree with appellant that where additional work is required or is ordered or made necessary by the owner, the need for which could not be reasonably foreseen or anticipated by the contracting parties, the contractor is indeed entitled to just compensation. However, the case before us on its facts, lacks such requisites. Here, the additional work was to be performed only if core samples of the seal-bedrock jointure were unacceptable, no matter what the cause. A search of the record affords no conclusive reason for the separation or vacuolization of the seal-bedrock jointure, and while the failure to recover adequate core samples perhaps may be unfortunate and not wholly expected yet such failure was not unforeseeable.

In this regard the law of other jurisdictions is helpful. In *Kerr* v. *State* (1928), 127 Me. 161, 142 A. 197, wherein it was held that an abutement and piers of a bridge which proved

to be more difficult to construct than anticipated would not entitle the contractor to extra compensation, the court said:

"* * * But expectations, of whatsoever nature, unproduced by fraud, nor brought about by conduct so gross as to imply bad faith, cannot relieve a contractor from contractual obligation. * * *" 142 A. 200.

And in *Giertsen Co.* v. *State* (1967), 34 Wis. 2d 114, 148 N. W. 2d 741, wherein the contractor, like appellant here, was under a duty before submitting a bid, to inspect the site, specifications and plans and to satisfy himself as to the conditions to be encountered.[3] The court held there that repeated high water flooding which caused the contractor to do "extra" work was "one of the precise hazards that the parties had in mind when they formally imposed an investigative duty upon the builders." 148 N. W. 2d 743-744.

A case factually similar to that considered by us is *Thomas Kelly & Sons* v. *City of Los Angeles* (1935), 6 Cal. App. 2d 539, 45 P. 2d 223, wherein the court quoted the general rule of contractual construction as it appeared in *Simpson* v. *United States* (1898), 172 U. S. 372, 379, 19 S. Ct. 222:

"In considering a case where the nature of the soil encountered by a contractor in building a drydock was different from that anticipated, the Supreme Court of the United States held that additional compensation should not be allowed, and stated: 'The rule by which parties to a written contract are bound by its terms, and which holds that they cannot be heard to vary by parol its express and unambig-

---

3. The Standard Specifications of the State Highway Department of Indiana for 1960 were by reference incorporated into and made a part of the contract between the State of Indiana and appellant's assignor. Such Specifications provided as follows:

"The Bidder is required to examine carefully the site of the work, the proposal plans, specifications, supplemental specifications if any, contract form, and special provisions pertaining to the work contemplated, and the submission of a proposal shall be considered prima facie evidence that he has judged for and satisfied himself as to the conditions to be encountered, the character, quality and quantities of work to be performed and materials to be furnished, and the requirements of these specifications and the contract."

uous stipulations, or impair the obligations which the contract engenders by reference to the negotiations which preceded the making of the contract, or by urging that the pecuniary result which the contract has produced has not come up to the expectations of one or both of the parties, is too elementary to require anything but statement.' "

The California Court then concluded that the trial court had erred in awarding judgment for the contractor for "extra work" because "it appears as a matter of fact from undisputed evidence that it was not extra work but merely extra difficulty in doing the work called for by the contract. . . ." 45 P. 2d 226.

The general principle supported by the above-cited cases is set forth in 11 C.J.S., *Bridges,* § 20, p. 1031, as follows:

"In the absence of fraud or bad faith on the part of the public authorities, unexpected difficulties encountered in building a bridge do not relieve the contractor from his obligations so as to entitle him to extra compensation for the additional work or materials rendered necessary, and extra difficulty encountered in doing the work called for by the contract does not constitute extra work within the meaning of a clause providing for payment for extra work."

Further, as a matter of custom and practice the contractor incurs the risk of the unexpected:

"The risk of unexpected cost and difficulty in the performance of construction contracts is usually carried by the building contractor. * * *" 3 Corbin on Contracts § 598

The law in Indiana is equally well settled:

"* * * [P]erformance is not excused by a mere inability to perform, by the fact that the contract causes hardship is burdensome, or unprofitable * * *" 6 I.L.E., *Contracts,* § 230 and cases there cited.

It is our opinion that the situation before us does not warrant compensation for extra work but reflects rather adherence to

a stated contract provision.[4] In upholding the contract on this point we cannot say as a matter of law that the possibility of rejection of a completed phase of construction as not conforming to plans and specifications, was unanticipated by the contractor, or that it bore the imprint of unforeseeability.

## NO BREACH OF WARRANTY BY STATE

Another theory relied upon by the appellant is that of warranty. The applicant reasons that the State breached a warranty to the contractor that a foundation satisfactory to the State could be constructed according to plans and specifications drawn by the State and at an elevation chosen by the State. The trial court in a Special Finding did, in fact, find that plans and specifications for the proposed substructure were submitted to the appellant to induce submission of a bid, and that a warranty did exist. The court's finding was as follows:

---

4. On cross-examination, Mr. Arthur Schlin, Jr., Vice-President of Allied Structural Steel Company and project head for the company division which constructed the Evansville-Henderson bridge substructure, testified to his awareness of the State's right to reject:

"Q. Now at the time you signed this contract were you not aware the contract you were signing provided that unsatisfactory quality of seal concrete or separation of the seal concrete from the bedrock by any unsuitable material may be cause for rejection of the seal concrete, and removal and replacement of the seal concrete shall be done at no additional cost to the State? Were you aware of that?
A. Yes.
Q. What did you think it meant?
A. Just what it said.
Q. What is said?
A. Yes.
Q. In other words, you understood it to be your responsibility to get a tight bond on in the alternative an absence of any unsuitable material between the bedrock and the seal concrete?
* * *
A. I understood it to be our responsibility to pour seal concrete on bedrock, not on unsuitable material.
Q. Then is the answer to my question 'yes'?
A. I believe so, yes."

"* * * By such plans and specifications defendant warranted and represented to the plaintiff that concrete foundation seals satisfactory to defendant could be constructed at locations and elevations selected by defendant if the work involved therein were performed in a good and workmanlike manner pursuant to a method of construction authorized by the plans, specifications and other contract documents. * * *"

The rule regarding implied warranty of fitness which we here adopt as applicable was stated by the majority in *Friederick* v. *County of Redwood* (1922), 153 Minn. 450, 451, 190 N. W. 801, 802, although in that case, it was a warranty by the contractor which was involved. The Minnesota Court held:

"* * * [a contractor] cannot be held to guarantee that work performed as required by [prescribed plans] will be free from defects, or withstand the action of the elements, or accomplish the purpose intended. Where the contract specifies what he is to do and the manner and method of doing it, and he does the work specified in the manner specified, his engagement is fulfilled and he remains liable only for defects resulting from improper workmanship or other fault on his part, *unless there be a provision in the contract imposing some other or further obligation. * * *"* (Emphasis supplied)

In Indiana, recovery of additional compensation for breach of warranty has been upheld in several cases in which the necessity for extra work resulted from acts, errors, or mistakes of the owner's engineers, or where the structure could not be constructed according to furnished plans and specifications. *Connersville Country Club* v. *F. N. Bunzendahl, Inc., supra; The Board of Commissioners of Carroll County* v. *O'Connor* (1893), 137 Ind. 622, 37 N. E. 16. Here, there was no evidence that the plans and specifications, or that the choice of location for the substructure, were insufficient for the purpose intended. Accordingly we hold, in keeping with the judgment of the trial court, that the warranty by the State of its plans and specifications was not breached.

## STATE WAS NOT ESTOPPED TO REJECT WORK DONE AFTER POURING OF THE SEAL

Appellant further contends that since State inspectors were present throughout the progress of construction, and since the State conducted a thorough inspection of the bedrock prior to ordering the seal poured, the State waived its right to reject the seal. In the cases cited in support of appellant's position there were authorized inspectors present during the entire project who objected neither to faulty methods nor to improper materials used, or who did not order rejection until the project was completed when they could have more timely done so. *Schliess* v. *City of Grand Rapids* (1902), 131 Mich. 52, 90 N. W. 700; *City of St. Clair Shores* v. *L & L Construction Co.* (1961), 363 Mich. 518, 109 N. W. 2d 802; *Board of Commissioners' of Carroll County* v. *O'Connor, supra.* The inequity which is apparent in these cases, however, is not present in the case at bar. Had appellee here made only one final inspection of the substructure, without making reasonable step-by-step checks, we would, of course, agree with appellant's charges not only of waiver of defect, but also that such a provision in a contract under these circumstances would constitute an unconscionable risk as to possible "extra" work. Here, the contract allowed no accumulation of insufficient or faulty work. Each step was checked at the earliest opportunity.

In *State, ex rel.* v. *City of Indianapolis* (1919), 188 Ind. 685, 123 N. E. 405, the court recognized that where the contract calls for inspection of work as it progresses, all defects which are discoverable by reasonable inspection and which are not discovered are deemed waived. Reasonable inspection in the case at bar, in which all critical operations leading to completion of the seal were accomplished under water and without visual contact, must be held to include both the bedrock inspection by divers prior to pouring of the cement seal and the requirement of "adequate proof core samples" taken upon hardening of the seal. There was

no opportunity for the State to inspect during the pouring operation. Core sample testing provided the most reasonable method of ascertaining unseen conditions. Therefore, under the circumstances of this case, the State cannot be held to have waived any defects which may have appeared at the seal bedrock jointure, by failure to object in advance of that step in the construction process which disclosed the defect.

We cannot conclude this opinion without noting that appellee's brief upon the merits was of little, if any, assistance to the court in the determination of the appeal. The law remains, however, that the burden does not fall upon an appellee to defend his judgment; rather it is incumbent upon an appellant to clearly demonstrate that under the facts and the applicable law, error was committed entitling him to reversal. Appellant here, despite an extremely comprehensive, well-reasoned and well-written brief has not met that test.

Notwithstanding appellee's failure to provide much enlightenment in the matters argued by appellant, the claim of the appellant is in our view, necessarily defeated by the unambiguous provisions of the contract in question when viewed in the light of the law deemed here applicable.[5]

For all of the foregoing reasons we affirm the judgment below.

Lowdermilk, C.J. and Carson, J., concur; Lybrook, J., not participating.

NOTE.—Reported in 265 N. E. 2d 49.

---

5. In this connection, we feel bound to state that once the merits of an appeal are reached, it is the solemn obligation of this court to determine the law which controls the decision, whether or not counsel for one or both parties adequately perform his or their appellate duties. We so state with a caveat to future appellee's counsel who would see in this opinion an open invitation to rely upon the court for affirmance. The time and patience of this court and of the individual members thereof is limited. Appellees would be advised to bolster their confidence in the wisdom and correctness of the trial court with ample argument and citation of applicable authority.