**PSI ENERGY, INC., an Indiana Corporation, Appellant (Defendant Below),**

v.

**AMAX, INC., a New York Corporation, and Amax Coal Company, a Delaware Corporation, Appellees (Plaintiffs Below).**

No. 30S05–9412–CV–1193.

Supreme Court of Indiana.

Dec. 9, 1994.

---

J. William DuMond, Plainfield, James L. Brand, Greenfield, Randall L. Sarosdy, Washington, DC, for appellant.

G. Daniel Kelley, Jr., Edward P. Steegmann, Indianapolis, for appellees.

SHEPARD, Chief Justice.

PSI Energy and AMAX Coal agreed to arbitrate disputes that might arise under their contract for the purchase of coal. A dispute did arise, and PSI sought to submit it to arbitration. AMAX initiated this lawsuit to stay the arbitration. While AMAX does not challenge the validity of its contract containing the arbitration clause, it maintains that this particular dispute is not arbitrable and seeks a judicial determination to that effect. The Court of Appeals correctly held that the arbitration should go forward.

### I. The Contract

To ensure a steady supply of fuel for its Gibson Generating Station, appellant PSI Energy, Inc., a large electric utility, and appellee AMAX Inc., signed a long-term coal supply contract in 1970. Originally set to expire in 1990, the contract was amended in 1983 and extended to the year 2002. AMAX and PSI considered the possibility that disputes would arise during the long duration of this contract, and they agreed to arbitrate "any controversy, claim, counterclaim, defense, dispute, difference, or misunderstanding arising out of or relating to" the contract "[e]xcept as otherwise specifically provided for herein. . . ." *Coal Supply Agreement be-*

tween *AMAX and PSI* § 28, at 36 (hereinafter *Agreement*).

This dispute began in the summer of 1990, when PSI invoked the "gross inequities" clause of the agreement, claiming that AMAX was reaping excessive benefits under their contract. The longer the term of a contract, the greater the risk of disadvantage to one party as the economic conditions on which its terms were based change over time. PSI and AMAX sought to minimize their downside risk by providing a mechanism short of breach of contract for a disadvantaged party to escape onerous contractual obligations. They included in their agreement the following provision:

> Section 17(i) *Gross Inequities.* The Parties hereto recognize that conditions or events beyond the control of either Party (including inflation or deflation of the economy or inefficient operation of the Mine) may result in a gross inequity to either Party. Whenever an agreement is reached between the Parties hereto that a gross inequity has occurred as the result of such conditions or events, the parties agree to renegotiate this Agreement in such a manner that such gross inequity is removed.

*Agreement* § 17(i), at 25. The section does not contain any language providing a means other than arbitration for the resolution of conflicting interpretations as to its meaning.[1]

## II. The Path to the Courthouse

PSI wrote to AMAX on July 30, 1990, claiming that it had "incurred a gross inequity," and requested renegotiation pursuant to section 17(i). PSI raised other issues as well, and, invoking section 28, suggested submitting their differences to arbitration. AMAX balked at the request for renegotiation, focusing on the language in section 17(i) pro-

viding for renegotiation "[w]henever an *agreement* is reached between the Parties hereto that a gross inequity has occurred...." *Id.* (emphasis added). It also disclaimed any authority for arbitrators concerning disagreements about the existence of a gross inequity. Faced with AMAX's refusal to renegotiate, PSI sought to resolve the question of arbitrability through arbitration.

AMAX brought suit in Marion Superior Court to block arbitration of the gross inequities issue. After a change of venue, the Hancock Superior Court granted AMAX's Application for Stay of Arbitration Proceedings and denied PSI's Application for Order Compelling Arbitration. The Court of Appeals reversed, finding ambiguity in the language of the gross inequities clause, which made that clause susceptible to interpretation in accordance with the terms of the general arbitration clause. *PSI Energy, Inc. v. Amax Coal Company* (1993), Ind.App., 621 N.E.2d 1157. We agree with the Court of Appeals.

## III. Wherefore Arbitration?

Indiana was surely among the first jurisdictions to sanction arbitration as a means of dispute resolution. Even before Indiana became a State in 1816, the territorial legislature adopted "An Act authorising and regulating arbitrations." Laws of the Indiana Territory, ch. XXXII (1807). For nearly two centuries, Hoosiers have had recourse to "the umpirage or arbitration of any person or persons, to be by them, mutually chosen" for the purpose of resolving legal controversies. *Id.*[2]

Nineteenth century judges viewed prospective agreements to arbitrate with some skepticism. *See, e.g., Kistler v. Indianapolis & St.L. R.R.* (1882), 88 Ind. 460, 464. Arbitration after the dispute arose, however, has

---

1. AMAX acknowledges the absence of any specific mechanism in the gross inequities clause. In his October 30, 1990 letter to PSI Executive Vice President Jon Noland, AMAX Vice President for Law and Governmental Affairs Wayne Gresham first observes that "AMAX understands that PSI is prepared to proceed with AMAX in order to determine if the parties can reach agreement whether a gross inequity has occurred" and then acknowledges that their agreement "is silent on the manner in which the parties are to proceed...." R. at 30.

2. Here the parties provided for the submission of contract disputes to a panel of three arbitrators. Section 28 of the agreement provides for arbitration "before three arbitrators, one of whom shall be named by Seller, one by Purchaser and a third of whom shall be named by the two arbitrators appointed by Seller and Purchaser, respectively." *Agreement* at 37.

always been part of Indiana's statutory and common law. As Judge Isaac Blackford observed in 1835, "we find that any persons, though no suit was pending between them, might agree to submit their matters of difference to arbitrators; and that their agreement for this purpose might be in writing...." *Titus v. Scantling* (1835), 4 Blackf. 89, 91.

Indiana's current arbitration regime commenced in 1969, when the legislature adopted the Uniform Arbitration Act, Ind.Code Ann. ch. 34–4–2 (West 1983 & Supp.1994). In more recent years, this Court has adopted a comprehensive set of rules for alternative dispute resolution (ADR), including a rule on arbitration. Ind. Alternative Dispute Resolution Rule 3.

As court dockets become more crowded, parties entering into contractual relationships are looking favorably on various methods of ADR as a way to avoid the time and expense of litigation. A recent survey of Fortune 1000 corporations indicated that those using ADR had increased their use of those procedures by 200% in one five-year period.[3] More and more corporations have agreed in advance to settle their differences not in front of a judge, but before one or more arbitrators.[4] At least for the resolution of private commercial disputes such as the case at bar, ADR is also preferable from a public policy perspective,[5] freeing scarce judicial resources to devote to questions of wider public import. *See generally* Leon Sarpy, *Arbitration as a Means of Reducing Court Congestion,* 41 Notre Dame Lawyer 182 (1965).

### IV. This Contract Dispute

AMAX asserts that questions of arbitrability are for the court to determine, not an arbitrator. It relies on various precedents from our Court of Appeals stating that the existence of a valid agreement to arbitrate is "a threshold question for judicial determination." *See, e.g., McCrary Eng'r Corp. v. Town of Upland* (1985), Ind.App., 472 N.E.2d 1305, 1307 (citing *Great Am. Trading v. I.C.P. Cocoa, Inc.,* 629 F.2d 1282, 1288 (7th Cir.1980)).

■ Certainly, the validity of an arbitration agreement is a justiciable question, for as Justice Brennan observed more than thirty years ago, "the arbitration promise is itself a contract." *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 569, 80 S.Ct. 1343, 1347, 4 L.Ed.2d 1403 (1960) (Brennan, J., concurring). Before a court compels arbitration, it must resolve any claims the parties had concerning the validity of the contract containing the arbitration clause. Once satisfied that the parties contracted to submit their disputes to arbitration, however, the court is required by statute to compel arbitration.[6] Judicial inquiry is thus limited to the validity of the contract containing the arbitration clause, not the construction of that clause. More particular to this case, when a valid contract contains a broad arbitration clause, resolution of disputes about various other clauses should be through arbitration.

■ AMAX does not question the validity of its contract with PSI. It explicitly acknowledges the legitimacy of the section 28 arbitration clause. Instead, AMAX seeks a judicial determination that the parties had not agreed to arbitrate whether a gross inequity had occurred. Courts are certainly adept at interpreting contracts, but a court cannot resolve the parties' dispute in the instant case without also eviscerating the arbitration clause of their contract. *See, e.g., Goebel v. Blocks & Marbles Brand Toys* (1991), Ind.App., 568 N.E.2d 552, 557 (holding that trial court "abused its discretion" when it ruled on contractual disputes after it

---

**3.** John H. Wilkinson, *ADR is Increasingly Effective, Averts Litigation in Many Cases,* NAT'L L.J., Apr. 4, 1988, at 22, 23.

**4.** *Commercial Caseload Doubles in Past Decade,* AAA Reports, ADR REP (BNA)., Vol. 4, No. 6, at 86 (Mar. 15, 1990).

**5.** *See, e.g., School City v. East Chicago Federation of Teachers* (1993), Ind., 622 N.E.2d 166, 169

(endorsing arbitration as alternative to "often ponderous and costly judicial proceedings") (citation omitted).

**6.** The Uniform Arbitration Act states: "On application of a party showing an agreement [to arbitrate], and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration." Ind.Code Ann. § 34–4–2–3(a).

had determined the existence of a valid contract containing an arbitration clause).

The parties here chose all-encompassing language in deciding what to arbitrate. They agreed that "any controversy, claim, counterclaim, defense, dispute, difference or misunderstanding arising out of or relating to this Agreement or breach thereof shall be settled by arbitration. . . ." *Agreement* § 28, at 36. While parties to such contracts are sometimes moved to seek a judicial remedy when differences arise, judicial intervention can undermine legitimate expectations based on an ADR clause produced through due bargaining, and actions brought despite the presence of such clauses should be viewed with disfavor. *See, e.g., Georgia Power Co. v. Cimarron Coal Corp.*, 526 F.2d 101, 106 (6th Cir.1975), *cert. denied*, 425 U.S. 952, 96 S.Ct. 1727, 48 L.Ed.2d 195, (1976) ("In the absence of language withdrawing this provision [for correcting gross inequities] from the arbitration requirement it is the duty of the court to resolve any doubts in favor of arbitration.").

This is not a contract of adhesion; both sides bargained for each term of the contract, including the arbitration clause. PSI appropriately asserts that the contract clause which calls for the parties to renegotiate the contract "[w]henever an agreement is reached ... that a gross inequity has occurred" is silent as to what the parties should do if they do not agree on the question of whether the changed conditions constitute a gross inequity. Absent language to the contrary, the arbitration clause applies to the disagreement about "gross inequities".

*V. Conclusion*

We grant transfer, summarily affirm the opinion of the Court of Appeals, Ind. Appellate Rule 11(B)(3), and reverse the trial court.

DeBRULER, GIVAN, DICKSON and SULLIVAN, JJ., concur.