MPACT CONSTRUCTION GROUP, LLC, Appellant (Defendant below),

v.

SUPERIOR CONCRETE CON-STRUCTORS, INC., Appel-lee (Plaintiff below),

and

Flying J, Inc., FJI Plaza Company III, LLC, Lehman Brothers Holdings, Inc. d/b/a Lehman Capital, a Division of Lehman Brothers Holdings, Inc., Gary's Plumbing Service, Inc., Kober-stein Trucking, Inc., Combs Land-scape & Nursery, Inc, B & B Electric Co., Inc., June Rinsch, in her capacity as the Gibson County Treasurer, Ap-pellees (Defendants below),

and

J.D. Music Tile Company, Inc., and E & B Paving, Inc., Appellees (Intervenors below).

No. 26S01–0307–CV–349.

Supreme Court of Indiana.

Feb. 4, 2004.

Steven S. Hoar, Evansville, IN, Don L. Smith, Nashville, TN, Attorneys for Appellant.

Angela L. Freel, James D. Johnson, R. Steven Krohn, James E. Stoltz, Robert F. Stayman, Evansville, IN, Jerry D. Stilwell, Princeton, IN, Attorneys for Appellees.

ON PETITION TO TRANSFER FROM THE INDIANA COURT OF APPEALS, NO. 26A01–0209–CV–345.

SULLIVAN, Justice.

When the owner failed to pay for work and supplies on its travel plaza, a subcontractor foreclosed on its mechanic's lien. The general contractor sought to compel arbitration among the owner, general, and all subcontractors. While we acknowledge arbitration's utility in this kind of multi-party dispute, our inspection of the contract documents indicates that the subcontractors did not agree to arbitrate the issues in dispute here.

### Background

MPACT Construction Group, LLC, a general contractor, entered into a contract with Flying J, Inc. to construct a travel plaza in Gibson County, Indiana.[1] Flying J was the owner of the construction plaza at the time, and it is now owned by FJI Plaza III, LLC. MPACT entered into several contracts with subcontractors[2] ("Subcontractors") to do the project work. Flying J failed to pay for all of the work and supplies, and so MPACT and some of the Subcontractors recorded mechanic's liens against Flying J. One of the Subcontractors, Superior Concrete Constructors, Inc., filed an action to foreclose its mechanic's lien. Several counterclaims and cross-claims for the foreclosure of mechanic's liens and for breach of contract were filed among the various parties.

The contract between MPACT and Flying J is an American Institute of Architects ("AIA") Standard Form Agreement Between Owner and Contractor ("General Contract"). Articles 1 and 9 of the General Contract incorporate by reference the AIA General Conditions of the Contract for Construction ("General Conditions"), and the General Conditions contain an arbitration clause. However, the subcontracts were not AIA standard form con-

---

1. MPACT and Flying J also entered into a contract to construct a travel plaza in Oklahoma. The Court of Appeals stated: "Because the Oklahoma contract does not appear to have bearing on the present appeal, and based upon counsel's statements at oral argument, we do not expressly address it herein." *MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 785 N.E.2d 632, 635 n. 3 (Ind.Ct.App.2003). Similarly, we do not address that contract here.

2. The subcontractors are Superior Concrete Constructors, Inc., Gary's Plumbing Service, Inc., Koberstein Trucking, Inc., Combs Landscape & Nursery, Inc., B & B Electric Co., Inc., J.D. Music Tile Company, Inc., and E & B Paving, Inc.

tracts but instead were contracts prepared by MPACT. After approximately six months of preparing for litigation, MPACT filed a motion to stay litigation and compel arbitration. The trial court summarily denied its motion. The Court of Appeals reversed in part, granting the motion as to Flying J, and affirmed in part, denying the motion as to the Subcontractors. *MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 785 N.E.2d 632, 639, 640 (Ind.Ct.App.2003). We reach the same result as the Court of Appeals.

### Discussion

The main issue is whether MPACT and the Subcontractors agreed to arbitrate disputes arising out of their business dealings. Because no explicit arbitration provision is contained in the subcontracts, we must determine if the arbitration provision in the General Conditions was incorporated by reference into the subcontracts.

### I

■ The Federal Arbitration Act ("FAA") applies to written arbitration provisions contained in contracts involving interstate commerce. 9 U.S.C. §§ 1, 2 (2000). MPACT, Flying J, FJI Plaza III, LLC, and many of the Subcontractors are from different states, and so this project constitutes interstate commerce. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400–01, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *Univ. Casework Sys., Inc. v. Bahre*, 172 Ind.App. 624, 634–35, 362 N.E.2d 155, 162 (1977); *Pathman Constr. Co. v. Knox County Hosp. Ass'n*, 164 Ind.App. 121, 133–34, 326 N.E.2d 844, 852–53 (1975).

■ The FAA applies only if parties agree to arbitrate. The Supreme Court has stated that both state law contract principles and federal substantive law of arbitration apply to answering this question. *First Options of Chicago, Inc. v.*

*Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (state law); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (federal law). In dicta, the Court has said:

> [T]he text of § 2 [of the FAA] provides the touchstone for choosing between state-law principles and the principles of federal common law envisioned by the passage of that statute: An agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law,* 'save upon such grounds as exist at law or in equity for the revocation of any contract.' Thus state law ... is applicable *if* that law arose to govern issues concerning the validity, revocability, or enforceability of contracts generally.

*Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987) (quoting 9 U.S.C. § 2). Recently, the Court clarified this statement, declaring that laws generally applicable to contracts may be applied to arbitration agreements, but "[c]ourts may not ... invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *see also PaineWebber Inc. v. Elahi*, 87 F.3d 589, 593 (1st Cir.1996) (referring to *Doctor's Associates*, the court stated "the Supreme Court explained that if a state law is applicable to contracts generally, it may be applied to arbitration agreements, but a state law that is specifically and solely applicable to arbitration agreements is displaced by the FAA").

The Court of Appeals, the Seventh Circuit, a federal district court applying Indiana law, and most other federal circuit courts of appeal have concluded that state law contract principles apply to determine whether parties have agreed to arbitrate. *St. John Sanitary Dist. v. Town of Scher-*

*erville,* 621 N.E.2d 1160, 1162 (Ind.Ct.App. 1993); *Gibson v. Neighborhood Health Clinics, Inc.,* 121 F.3d 1126, 1130 (7th Cir. 1997); *Ziegler v. Whale Sec. Co., L.P.,* 786 F.Supp. 739, 741 (N.D.Ind.1992); *Fazio v. Lehman Bros.,* 340 F.3d 386, 393 (6th Cir. 2003); *Bank One, N.A. v. Shumake,* 281 F.3d 507, 513 (5th Cir.2002), *cert. denied,* 537 U.S. 818, 123 S.Ct. 94, 154 L.Ed.2d 25 (2002); *Mirra Co. v. Sch. Admin. Dist. # 35,* 251 F.3d 301, 304 (1st Cir.2001); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 417 n. 4 (4th Cir.2000); *Schooley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 133 Lab. Cas. (CCH) ¶ 58,234, 1997 WL 45271, at * 2, 1997 U.S.App. LEXIS 1884, at * 5 (10th Cir. Feb. 5, 1997); *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2nd Cir. 1996).

MPACT contends, however, that whenever state law presents an obstacle to arbitration, federal law preempts the application of state law. It argues that the Court of Appeals, in finding no agreement to arbitrate, either misconstrued Indiana law or properly construed Indiana law but should have applied federal law instead. The Subcontractors respond that the "FAA only pre-empts state law which requires the parties to resolve their disputes in a judicial forum when the contracting parties have agreed to resolve their disputes through arbitration." (Joint Br. in Resp. to Pet. for Transfer at 6.) That is not the case here, they argue, because there was no agreement to arbitrate.

■ "The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.,* 489 U.S. 468, 477, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Nevertheless, "state law may . . . be pre-empted to the extent that it actually conflicts with federal law—that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). Preemption has been found in cases where state statutes explicitly made certain arbitration clauses unenforceable or placed serious burdens on the enforceability of arbitration provisions. *See, e.g., Doctor's Assocs.,* 517 U.S. at 683, 688, 116 S.Ct. 1652 (finding preemption where Montana law made arbitration clauses unenforceable unless the first page of the contract contained in underlined capital letters a statement that the contract was subject to arbitration); *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 269, 272–73, 282, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (reversing Alabama Supreme Court's denial of arbitration based on a state statute rendering predispute arbitration agreements invalid and unenforceable); *Southland Corp. v. Keating,* 465 U.S. 1, 10–16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (holding invalid on preemption grounds state statute making agreements to arbitrate franchise claims unenforceable). But no such statute is involved here. Nor is it the case that state law is hostile to arbitration. Indeed, Indiana policy favors arbitration. *PSI Energy, Inc. v. AMAX, Inc.,* 644 N.E.2d 96, 98 (Ind.1994) (stating that "Indiana was surely among the first jurisdictions to sanction arbitration as a means of dispute resolution" as it had a law allowing arbitration before Indiana became a state in 1816); *Ind. CPA Soc'y v. GoMembers, Inc.,* 777 N.E.2d 747, 750 (Ind.Ct.App. 2002) ("Indiana recognizes a strong policy favoring enforcement of arbitration agreements."); *see also* Uniform Arbitration Act, Ind.Code § 34–57–2–1 (1998).

■ MPACT focuses solely on the result. It is just not true, however, that

preemption occurs every time a court finds that the parties did not agree to arbitrate. If a court, fairly applying generally applicable state law contract principles and not singling out arbitration agreements for hostile treatment, finds that the parties did not agree to arbitrate, then federal law does not preempt. *See Perry*, 482 U.S. at 492 n. 9, 107 S.Ct. 2520 ("A court may not, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law."); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (the intention of the FAA was to put arbitration agreements "upon the same footing as other contracts") (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924)).

For these reasons, we will apply Indiana law to determine whether the Subcontractors agreed to arbitrate.[3]

■ MPACT further argues that even if Indiana law applies, the federal policy favoring arbitration should influence the question whether the parties agreed to arbitrate. The Subcontractors respond that a court "must first determine whether the parties generally agreed to arbitrate disputes." (Joint Br. in Resp. to Pet. for Transfer at 2.) We agree with the Subcontractors.

■ Whether the parties agreed to arbitrate any disputes is a matter of contract interpretation, and most importantly, a matter of the parties' intent. *AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir.2000) ("As with any contract, the touchstone for interpreting an arbitration clause must be the intention of the parties."). "Courts in Indiana have long recognized the freedom of parties to enter into contracts and have presumed that contracts represent the freely bargained agreement of the parties." *Trimble v. Ameritech Publ'g, Inc.*, 700 N.E.2d 1128, 1129 (Ind.1998); *Cont'l Basketball Ass'n v. Ellenstein Enters.*, 669 N.E.2d 134, 140 (Ind.1996). Consequently, imposing on parties a policy favoring arbitration before determining whether they agreed to arbitrate could frustrate the parties' intent and their freedom to contract. The Supreme Court has made this clear— "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quotations and citations omitted); *accord Homes by Pate, Inc. v. DeHaan*, 713 N.E.2d 303, 306 (Ind.Ct.App. 1999).

■ Additionally, courts have regularly distinguished the treatment given questions of the existence of an agreement to arbitrate and questions of the scope of an agreed-to arbitration clause. In determining the *scope* of an arbitration agreement, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt*, 489 U.S. at 476, 109 S.Ct. 1248; *accord Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. 927; *Bank One*, 281 F.3d at 513–14 n. 24.[4] Because there was already an

---

**3.** Some of the subcontracts included a choice of law clause stating that Indiana law would apply and others stating that Tennessee law would apply. Ind.Code § 32–28–3–17 (Supp. 2002), however, makes void any provision in "a contract for the improvement of real estate in Indiana" that "makes the contract subject to the laws of another state." Therefore, we will apply only Indiana law.

**4.** *Cf. First Options*, 514 U.S. at 944–45, 115 S.Ct. 1920 (requiring "clear and unmistakable" evidence that parties agreed to submit to an arbitrator the question who should de-

agreed-to arbitration clause in these cases, applying federal policy in construing the arbitration clause would not have frustrated the parties' intent. Using the policy favoring arbitration to decide whether the parties did in fact agree to arbitrate does not answer the question but rather avoids having to decide it. Only after it has been determined that the parties agreed to arbitrate their disputes does the policy favoring arbitration play an important role. We must determine, therefore, whether MPACT and the Subcontractors agreed to arbitrate without resort to the federal policy favoring arbitration.

## II

■ Whether MPACT and the Subcontractors agreed to arbitrate their disputes depends on whether the arbitration clause in the General Conditions of the General Contract was incorporated by reference into the subcontracts. "It is well settled that, under the Federal Arbitration Act, an agreement to arbitrate may be validly incorporated into a subcontract by reference to an arbitration provision in a general contract." *Maxum Founds., Inc. v. Salus Corp.*, 779 F.2d 974, 978 (4th Cir.1985); *R.J. O'Brien & Assocs. v. Pipkin*, 64 F.3d 257, 260 (7th Cir.1995); *cf. Wilson Fertilizer & Grain, Inc. v. ADM Milling Co.*, 654 N.E.2d 848, 854–55 (Ind.Ct.App.1995) (finding that under the Uniform Commercial Code § 2–207, a party cannot claim surprise to an arbitration clause incorporated by reference into the contract), *trans. denied.* In deciding whether the subcontracts incorporated by reference the arbitration provision, we must look to the language of the contract documents.

MPACT points to two clauses in the subcontracts to support its contention that the arbitration provision was incorporated by reference into the subcontracts. The first reads:

> [Article VI(b)] The Sub-contractor acknowledges that he has read the General contract and all plans and specifications, together with all amendments and addenda thereto, and is familiar therewith and agrees to comply with and perform all provisions thereof applicable to the Sub-Contractor. The intent of the Contract documents is to include all items necessary for the proper execution and completion of the work. The contract documents are complementary and what is required by any one shall be as binding as if required by all. Work not covered in the Contract documents will not be required, unless it is consistent therewith and is reasonable [sic] inferable therefrom as being necessary to produce the intended results.

The second reads:

> Contractor has heretofore entered into a General Contract with [Flying J], hereinafter called the Owner, to furnish and pay for all necessary and required labor, materials ... to perform all work required ... inclusive of, but not limited to the project plans and specifications ... schedules, drawings and amendments by addenda, as prepared by ... the Architect, and known as Flying "J" Travel Plaza, which are hereby made a part of the General Contract between the Owner and the Contractor and are hereby, made a part of this subcontract, as applicable to the work stated therein and pursuant to this subcontractor's intent to enter into this sub-contractual agreement, with reference to any and all of said work.

cide whether the parties agreed to arbitrate, because it is different from the question involving the scope of an arbitration provision, in which "the parties [already] have a contract that provides for arbitration of some issues").

MPACT argues that these provisions, and particularly the sentence, "The contract documents are complementary and what is required by any one shall be as binding as if required by all," show that the General Conditions, which were incorporated into the General Contract between MPACT and Flying J, were incorporated into the subcontracts. The Subcontractors respond, and the Court of Appeals agreed, that provisions of the General Contract were incorporated for the limited purpose of governing the work to be performed. They emphasize that the sentence MPACT relies on is preceded and followed by sentences pertaining specifically to work, and that this limits the effect of that sentence.

While the cited provisions support both arguments, the larger context suggests that the Subcontractors' construction is correct. *Allied Structural Steel Co. v. State*, 148 Ind.App. 283, 288, 265 N.E.2d 49, 52 (1970) ("The true meaning of a contract is to be ascertained from a consideration of all its provisions, and a liberal or technical construction of an isolated clause should not be indulged to defeat the true meaning."); *Gen. Ins. Co. of Am. v. Hutchison*, 143 Ind.App. 250, 254, 239 N.E.2d 596, 598–99 (1968) ("It is the general rule of law in our State that words, phrases, sentences, paragraphs and *sections* of a contract cannot be read alone."). Of particular importance is the language surrounding Article VI(b). Not only do the sentences within that provision specifically discuss the work to be performed, but all other provisions in the article of which it is a part relate to the work to be performed. Clause (a) of Article VI requires that the Subcontractor "supply adequate tools, appliances, and equipment, [and] a sufficient number of properly skilled workmen" to ensure that the work gets done "efficiently and promptly." Clause (c) discusses the Architect's control over the work to be performed. Clause (d) addresses the Sub-

contractors need to get permits and licenses. Taken as a whole, this article is about the work to be performed and nothing more. If the parties intended to bind the Subcontractors to arbitration, logic dictates that an incorporation by reference clause clearly apply to the entire contract—or be in a separate section on rights and remedies or at least with contract provisions on liability and indemnification—rather than with provisions relating to the work.

Other provisions are telling as well, though not conclusive. Article 5.3.1 of the General Conditions states:

> By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities which the Contractor, by these Documents, assumes toward the Owner and Architect. Each subcontract ... shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner.

Viewing this provision with the language of the subcontract that, "[t]he Sub-contractor acknowledges that he has read the General contract ... and is familiar therewith and agrees to comply with and perform all provisions thereof applicable to the Sub-Contractor," suggests that the Subcontractors are required to submit to arbitration. The Subcontractors agreed to comply with provisions of the General Contract applicable to them, and Article 5.3.1 of the General Conditions, as part of the General Contract, is applicable to sub-

contractors. Although Article 5.3.1 was probably intended to bind subcontractors directly, the language itself puts the burden on the contractor to obtain an agreement from subcontractors to assume the same responsibilities as the contractor assumes toward the owner. A comment from the American Institute of Architects, drafters of the General Conditions, provides some guidance. It first states, "A basic requirement of the contract is that subcontractors be bound by the terms of the contract documents. AIA Document A401 Standard Form Agreement Between Contractor and Subcontractor, so provides." Am. Inst. of Architects, *A201 Commentary* (1997). But the next sentence reads, "If other subcontract forms are utilized, care must be taken to coordinate them with Subparagraph 5.3.1." *Id.* This indicates that if the general contractor uses subcontract forms other than those provided by the AIA—which MPACT did in this case—it must in its own contract include a provision requiring the subcontractors to assume the same responsibilities that it assumes toward the owner.

MPACT may well have believed the language it used was sufficient to bind the Subcontractors to arbitration. It cites several cases to support its contention that the language in its subcontracts validly incorporated the arbitration clause by reference. The Subcontractors respond that all of those cases can be distinguished from this one. *Uniroyal, Inc. v. A. Epstein & Sons, Inc.*, 428 F.2d 523, 524 (7th Cir.1970) (in section of contract discussing general obligations, the subcontract stated that the subcontractor agrees "to assume toward [the contractor] all the obligations and responsibilities that [the contractor],

by those documents, assumes toward the Owner," and that "[i]n the matter of arbitration, their rights and obligations and all procedure shall be analogous to those set forth in this Contract"); *Kvaerner ASA v. Bank of Tokyo—Mitsubishi Ltd.*, 210 F.3d 262, 265 (4th Cir.2000) (subcontract used the phrase the "the same rights and remedies" and in a provision concerning default); *Maxum*, 779 F.2d at 979 (subcontract stated that "the Subcontractor shall be bound by, and expressly assumes for the benefit of the Contractor, all obligations and liabilities which the Contract Documents impose upon the Contractor"); *Exch. Mut. Ins. Co. v. Haskell Co.*, 742 F.2d 274, 275 (6th Cir.1984) ("Subcontractor hereby assumes the same obligations and responsibilities with respect to his performance under this Subcontract, that Contractor assumes towards Owner...."); *J.S. & H. Constr. Co. v. Richmond County Hosp. Auth.*, 473 F.2d 212, 213–14 n. 3 (5th Cir.1973) ("Subcontractor agrees to be bound to the Contractor by all of the terms of the agreement between the Contractor and the Owner and by the Contract Documents and to assume toward the Contractor all of the obligations and the responsibilities that the Contractor by those instruments assumes toward the Owner."); *Vespe Contracting Co. v. Anvan Corp.*, 399 F.Supp. 516, 520 n. 4 (E.D.Pa. 1975) ("Subcontractor ... shall assume towards Contractor all the obligations and responsibilities that the Contractor ... assumes towards Owner."). We agree that these cases are distinct from the case here. In all of the other cases, the language incorporating the arbitration provision is more clear and explicit than in the subcontracts here.[5]

**5.** MPACT also cited *U.S. Fid. & Guar. Co. v. West Point Constr. Co.*, 837 F.2d 1507 (11th Cir.1988), but the language in that case is conclusory and as such, does not aid MPACT's argument. Additionally, MPACT cited *J & S Constr. Co. v. Travelers Indem. Co.*, 520 F.2d 809 (1st Cir.1975), but it is not on point.

■ Courts are required to give effect to parties' contracts and to do so, courts look to the words of a contract. In contracting, clarity of language is key. Here, however, provisions in the subcontracts support both arguments, at least in part. When there is ambiguity in a contract, it is construed against its drafter. *Philco Corp. v. Automatic Sprinkler Corp. of Am.*, 337 F.2d 405, 408 (7th Cir.1964); *Smith v. Sparks Milling Co.*, 219 Ind. 576, 603, 39 N.E.2d 125, 135 (1942); *Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307, 1313 (Ind.Ct.App.1991), *trans. denied.* In this instance, the AIA Standard Form of Agreement Between Contractor and Subcontractor was not used. MPACT instead drafted its own subcontracts. It was therefore MPACT's responsibility to ensure that its subcontracts conformed to the requirements of the General Conditions and incorporated the arbitration clause. MPACT did not do so.

The problem in this case seems to have resulted from poor contract drafting and inadequate contract negotiations. Each side believed at the time of contract execution that the contract provided for what it wanted—in MPACT's case, for arbitration, and in the Subcontractors' case, not for arbitration. Regardless, it is clear that arbitration was not sufficiently discussed by the parties. This leads to one conclusion, that there was no meeting of the minds between the parties on the issue of arbitration. Consequently, we find that there was no agreement to arbitrate between MPACT and the Subcontractors and the Subcontractors are not required to arbitrate their disputes with MPACT.

MPACT also sought arbitration of its disputes with Flying J. The Court of Appeals found that the disputes were governed by the arbitration provision in the General Conditions of the General Contract, and held that MPACT was entitled to arbitration with Flying J. We summarily affirm the Court of Appeals on this point. Ind. Appellate Rule 58(A)(2).

### III

■ The Subcontractors additionally argue that MPACT waived its right to arbitrate, if such a right actually exists. Whether a party has waived the right to arbitration depends primarily upon whether that party has acted inconsistently with its right to arbitrate. *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 637 (7th Cir.2002); *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 588 (7th Cir.1992); *Kilkenny v. Mitchell Hurst Jacobs & Dick*, 733 N.E.2d 984, 986 (Ind.Ct.App.2000), *trans. denied*, 753 N.E.2d 8 (Ind.2001). This requires an analysis of the specific facts in each case. *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 756 (7th Cir.2002); *St. Mary's Med. Ctr.*, 969 F.2d at 588; *Kilkenny*, 733 N.E.2d at 986.

Some facts suggest that MPACT may have waived its right to arbitrate by actively participating in the litigation. *Ernst & Young LLP*, 304 F.3d at 757–58; *St. Mary's Med. Ctr.*, 969 F.2d at 589. MPACT filed a cross-claim against Flying J for breach of contract and filed cross- and counterclaims against Flying J and the Subcontractors to foreclose its own mechanic's lien. MPACT also participated in telephone conferences and a scheduling conference where summary judgment deadlines and a trial date were set.

■ The filing of counterclaims and cross-claims does not always indicate active participation in litigation. While all cross-claims are permissive, some counterclaims are compulsory, that is, a party must bring them or waive them. Ind. Trial Rule 13. A party should not be held to have waived its right to arbitrate when, in response to a complaint filed against it,

it raises counterclaims in order to preserve them. *Cf. Underwriting Members of Lloyds of London v. United Home Life Ins. Co.,* 549 N.E.2d 67, 71 (Ind.Ct.App. 1990) (stating that participation in discovery did not result in a waiver of arbitration because defendant was required by court order to do so), *adopted by,* 563 N.E.2d 609 (Ind.1990). MPACT's counterclaims in this case are compulsory. The cross-claims are not, and to that extent, MPACT could be seen as actively participating in the litigation. But that alone is not sufficient to establish a waiver, particularly in light of the other facts.

In its answer filed March 29, 2002, MPACT stated that it was not waiving its right to arbitration and in its affirmative defenses, requested that the claims be submitted to arbitration. *St. Mary's Med. Ctr.,* 969 F.2d at 589 (finding that defendant waived the right to arbitrate because in the ten months that passed since being sued, defendant filed a motion to dismiss or for summary judgment and then did not raise arbitration until losing its motion); *Kilkenny,* 733 N.E.2d at 987 ("This is clearly not a case where a request for arbitration was plead in the initial complaint and then not again asserted until discovery was complete or an unfavorable result on the individual claims was imminent."); *Lloyds,* 549 N.E.2d at 71 (finding no waiver because defendant "asserted its right to arbitrate throughout the proceedings"). MPACT also did not file motions to dismiss or for summary judgment before asserting its right to arbitrate. These facts show that MPACT acted consistently with its right to arbitrate, if it had one, and so its actions would not have constituted a waiver of that right.

### Conclusion

We grant transfer, summarily affirm the decision of the Court of Appeals reversing the trial court's denial of MPACT's motion to stay proceedings and compel arbitration as to Flying J, and affirm the trial court's denial of MPACT's motion as to the Subcontractors. This case is remanded to the trial court for further proceedings consistent with this opinion.

DICKSON and RUCKER, JJ., concur.

BOEHM, J., dissents with a separate opinion in which SHEPARD, C.J., joins.

BOEHM, J., dissenting.

I respectfully dissent. This is a typical multiparty construction litigation, where various parties are pointing fingers in various directions and claiming that whatever went wrong with the project is somebody else's—anybody else's—problem. I agree that state law governs the formation of the contract and that nothing in the Federal Arbitration Act requires that these disputes between subcontractors and the general contractor be arbitrated unless the parties agreed to that method of dispute resolution. I believe, however, that these agreements do call for arbitration of the entire multiparty dispute among the owner, the general contractor, and these several subcontractors.

The agreement between the general contractor and the owner is a standard printed form AIA construction agreement. All agree that that contract includes an enforceable arbitration clause, and an undertaking to bind subcontractors to the same terms that obligate the general. The general's agreements with the subs provide that each sub acknowledges the principal agreement and agrees to be bound by it. The principal agreement provides, *inter alia,* that the general will impose conforming conditions on all subs. These agreements are among businesses fully familiar with this sort of arrangement, and fully cognizant that the last thing either the general or the owner wants is piece-

meal litigation with different subs. The result the majority reaches produces an arbitration between the owner and the general and litigation with one or more subs in a separate forum. The majority concedes that the general intended to bind the subs to arbitration, but points to imprecision in the language used to accomplish that. It seems to me that the subs did understand, or should have, that arbitration was intended. They should be held to have accepted arbitration when they accepted these agreements. Accordingly, I would require arbitration of this entire dispute in one proceeding.

The majority points to what I agree is less than elegant phrasing of the agreement, and what it describes as "inadequate contract negotiations." I think these agreements, given the context, were sufficient to make clear to the subs that they were expected to arbitrate their disputes with the general or the owner. Particularly in an industry where arbitration is widely used, ambiguity does not necessarily lead to the conclusion that no meeting of the minds occurred. Rather, I would conclude that ambiguity should be construed in favor of finding an agreement to arbitrate where that is commonplace in the industry. We have on several occasions expressed support for the policy under Indiana law favoring arbitration. *PSI Energy, Inc. v. AMAX, Inc.*, 644 N.E.2d 96, 99 (Ind.1994); *Sch. City v. East Chicago Fed'n of Teachers, Local No. 511*, 622 N.E.2d 166, 169 (Ind.1993). These rulings also support finding an agreement to arbitrate where the documents support that conclusion, albeit with less than precision.

SHEPARD, C.J., joins.